UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> METRO PAIN SPECIALISTS PROFESSIONAL CORPORATION d/b/a METRO PAIN SPECIALISTS MEDICINE, LEONID SHAPIRO, M.D., YAN MOSHE a/k/a YAN LEVIYEV, PREMIER ANESTHESIA ASSOCIATES PA, AND NIZAR KIFAIEH, M.D., <br><br> Defendants. | C.A. No. |

**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink, P.C., allege as follows:

I.   **INTRODUCTION**

1.      The Defendants damaged Allstate by collecting payment on fraudulent claims submitted by Defendants Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine ("Metro Pain") and Premier Anesthesia Associates, PA ("Premier").

2.      The Defendants' scheme was designed to exploit New York's No-Fault laws, which provide insurance coverage to persons ("claimants") involved in automobile accidents.

3.  New York was an ideal venue for this scheme because every claimant is eligible for at least $50,000.00 in coverage for medical expenses.

4.  Engineered by Defendant Yan Moshe ("Moshe"), this scheme was carried out with the help of Defendants Leonid Shapiro, M.D. ("Shapiro") and Nizar Kifaieh, M.D. ("Kifaieh"), each of whom are licensed physicians.

5.  Licensed physicians were an integral part of this scheme.

6.  Moshe is not a doctor, nor is he licensed to provide any type of healthcare services in New York.

7.  Moshe therefore was, and is, prohibited from (a) providing or billing for medical services, or (b) owning or controlling medical providers.

8.  Moshe evaded these prohibitions by installing Shapiro and Kifaieh as nominal owners, but then keeping all control of Metro Pain and Premier to himself.

9.  Forming Metro Pain and Premier enabled Moshe to bill for medical services.

10.  Metro Pain was installed as a medical provider at several No-Fault clinics where it billed for a variety of fraudulent and medically unnecessary evaluations, injections, and other therapies.

11.  Metro Pain was also used as a vehicle to generate referrals for surgical procedures, which were then hosted and billed by surgery centers owned by Moshe.

12.  Moshe controlled Metro Pain throughout this scheme.

13.  Moshe needed to control Metro Pain to ensure that patients were referred to his surgery centers.

14.  Shapiro's involvement was vital because Metro Pain needed to be owned by a licensed physician.

15.     Shapiro's nominal ownership made Metro Pain look like a legimate medical service entity.  The Defendants used this false portrayal of Shapiro's ownership to support their phony representations that Metro Pain was eligible for No-Fault reimbursement.

16.     Shapiro never fully controlled Metro Pain.

17.     Shapiro never actually practiced any medicine through Metro Pain:

```
6    Q.     Was there ever a time when you performed
7    services on behalf of Metro Pain?
8    A.     No.
```

18.     At times, Shapiro received no compensation even though Metro Pain was generating a steady volume of No-Fault claims:

```
8         Q   Do you pay yourself as an employee or do
9    you just take a draw or distribution?
10        A   Nothing yet.
11        Q   Yet, since the existence of Metro Pain?
12        A   Correct.
13        Q   You've taken no salary and no draw?
14        A   No.  Seriously.
15        Q   That's correct, what I am saying?
16        A   Correct.
```

19.     Despite the volume of billing, Metro Pain was operated at a loss leaving Shapiro with nothing.

20.     Metro Pain was kept in a constant state of indebtedness, which was designed to strip control of the company from Shapiro.

21.     Moshe siphoned money from Metro Pain using financing agreements and other means.

22.     Shapiro was under Moshe's control the entire time, either as the medical director of Moshe's surgery centers, as an anesthesiologist at Moshe's sister's medical practice, or as a department head at Moshe's hospital.

23.     Metro Pain purposely associated with medical clinics that had existing patient bases.

24.     Patients of these clinics were funneled to Metro Pain, evaluated, and then referred for expensive and unwarranted pain management procedures, which were performed by a Metro Pain physician at Moshe's surgery centers located in New Jersey.

25.     The pain management procedures were a sham.  Most of the procedures were injections that took mere minutes to complete, yet they generated substantial charges, which enabled Moshe to double-dip—and sometimes triple-dip—into the patients' available No-Fault benefits by billing the procedures under Metro Pain, and then billing the surgical facility fees and anesthesia services through other companies owned by Moshe, such as Premier.

26.     The injections were not medically necessary—and therefore not compensable under New York's No-Fault laws—yet the Defendants still caused Metro Pain to seek and collect No-Fault payments for these services.

27.     The Defendants furthered this scheme by forming Premier as a new entity, using Shapiro's name and licensing credentials.

28.     Premier's formation enabled Moshe to bill separately for ansesthesia services when procedures were performed at one of his surgery centers.

29.     Upon information and belief, Shapiro ceded control of Premier to Moshe, and Moshe retained control over Premier even after Kifaieh replaced Shapiro as record owner.

30.     Moshe's unlawful control over Premier gave him another way to submit fraudulent No-Fault claims.

31.     The services billed by Premier were fraudulent because they were not medically necessary—even if the pain management procedures themselves were warranted (they were not), there was still no basis to provide anesthesia.

32.     Overall, Allstate was damaged by the Defendants' fraudulent No-Fault claims.

33.     Metro Pain's and Premier's No-Fault claims were fraudulent because the entities were never eligible to seek or collect No-Fault payments.

34.     Metro Pain and Premier were never eligible for No-Fault payments because they were illegally owned and controlled by Moshe, and because they billed for false and fraudulent medical services.

35.     Metro Pain and Premier were also ineligible for No-Fault payments because they engaged in other illegal conduct such as splitting their professional fees and profits with Moshe, and engaging in unlawful patient referrals and other financial arrangements.

36.     Premier also violated New York law by operating as an unregistered foreign corporation.

37.     Throughout this scheme, the Defendants knew that Metro Pain and Premier were ineligible to collect No-Fault payments, yet they still created statutory claim forms (i.e., NF-3 bills), which certified Metro Pain's and Premier's eligibility to collect No-Fault payments under New York law.

38.     Metro Pain's and Premier's NF-3 bills were submitted to Allstate through the U.S. Mail.

39.     Allstate reasonably relied on the facial validity of the records and bills mailed by Metro Pain and Premier—and the representations contained therein—when making  payments on Metro Pain's and Premier's No-Fault claims.

40.     The Defendants knew that Metro Pain's and Premier's No-Fault claims were false and fraudulent because the claims misrepresented or omitted material facts about Metro Pain's and Premier's right to be paid under New York's No-Fault laws.

41.     By this Complaint, Allstate brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common law fraud; and (c) unjust enrichment.

42.     This action seeks actual damages totaling over $1,844,949.00, which represent No-Fault payments that Allstate was wrongfully caused to make to Metro Pain and Premier during the course of this scheme.

43.     Additionally, Allstate seeks declarations pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay Metro Pain or Premier (or their agents) in connection with any No-Fault claims that have been submitted to Allstate.

44.     All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

45.     The Defendants designed this scheme to extract payments from Allstate, which were comprised of monies paid out by Allstate under automobile insurance contracts.

46.     In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the Defendants sought—and in many instances obtained—payment for the medical services that were not compensable under New York's No-Fault laws.

47.     The Defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

48.     Allstate estimates that the Defendants purposely submitted to Allstate hundreds of bills on behalf of Metro Pain and Premier knowing that the bills were fraudulent and not compensable under New York law.

## II.    THE PARTIES

### A.    PLAINTIFFS

49.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

50.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company were authorized to conduct business in New York.

### B.    DEFENDANTS

#### 1.    Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine

51.     Metro Pain is organized as a medical professional corporation ("PC") under New Jersey law with a principal place of business located at 790 Bloomfield Avenue in Clifton, New Jersey.

7

52.     Metro Pain is authorized to conduct business as a foreign professional corporation in the State of New York.

53.     As set out below, Metro Pain was infiltrated by Moshe and Shapiro, and used as an enterprise for the purpose of running a No-Fault fraud scheme.

54.     Moshe and Shapiro conducted the affairs of the Metro Pain enterprise (i.e., creating and submitting fraudulent No-Fault claims) through a pattern of mail fraud racketeering activity during the course of this scheme.

55.     At all relevant times, Shapiro falsely purported to be the sole officer, director, and shareholder of Metro Pain.

56.     However, at all relevant times, Shapiro failed to practice medicine through Metro Pain—he was nothing more than a nominal, figurehead owner who ceded all control of Metro Pain to Moshe, a non-physician.

57.     Moshe participated in the operation and management of the Metro Pain enterprise by exerting unlawful control over Shapiro and Metro Pain, including Metro Pain's professional fees and profits.

58.     Metro Pain was operated in violation of New York Business Corporation Law § 1508 because it was controlled by Moshe, a non-physician.

59.     Metro Pain violated New York Education Law § 6530 because Shapiro (a) failed to practice medicine through Metro Pain, and (b) allowed Metro Pain to operate outside of the supervision and control of a licensed physican.

60.     Metro Pain also billed for fraudulent and unnecessary medical services.

61.     Metro Pain was never lawfully entitled to seek or collect No-Fault payments under New York Insurance Law § 5102.

62. Metro Pain damaged Allstate by submitting fraudulent and non-compensable No-Fault claims, and then seeking and collecting payments from Allstate on those claims.

### 2. Premier Anesthesia Associates, PA

63. Premier is organized as a physician-owned professional association under New Jersey law.

64. Premier's principal place of business is located at 55 Meadowlands Parkway in Secaucus, New Jersey.

65. As set out below, Premier was infiltrated by Moshe, Shapiro, and Kifaieh, and then used as an enterprise for the purpose of running a No-Fault fraud scheme.

66. Moshe, Shapiro, and Kifaieh conducted the affairs of the Premier enterprise (i.e., creating and submitting fraudulent No-Fault claims) through a pattern of mail fraud racketeering activity during the course of this scheme.

67. As set out below, Shapiro and Kifaieh have falsely purported to be the sole officer, director, and shareholder of Premier during different parts of this scheme.

68. Shapiro and Kifaieh were sham owners of Premier. They did not practice through Premier, and were nothing more than figureheads that ceded all control to Moshe, a non-physician.

69. Premier registered with the State of New York Department of State as a foreign business corporation on or about April 15, 2020.

70. However, Premier billed Allstate for services at Moshe's New York ambulatory surgical center before Premier was authorized to operate in New York.

71. Moshe participated in the operation and management of the Premier enterprise by exerting unlawful control over Shapiro, Kifaieh, and Premier, including Premier's professional fees and profits.

72.     Premier was caused to aggressively seek and collect No-Fault payments from Allstate even though (a) Premier was unlawfully operated and controlled by Moshe, a layperson, and (b) Shapiro and Kifaieh—the supposed owners of Premier—did not even actually practice medicine through Premier.

73.     Premier was operated in violation of New York Business Corporation Law § 1508 because it was controlled by Moshe, a non-physician.

74.     Premier also billed for fraudulent and unnecessary medical services.

75.     Premier was never lawfully entitled to seek or collect No-Fault payments under New York Insurance Law § 5102.

76.     Premier damaged Allstate by submitting fraudulent and non-compensable No-Fault claims, and then seeking and collecting payments from Allstate on those claims.

### 3.    Leonid Shapiro, M.D.

77.     Leonid Shapiro, M.D. ("Shapiro") resides in and is a citizen of the State of New New Jersey.

78.     Shapiro was licensed to practice medicine in the State of New York and the State of New Jersey at all relevant times.

79.     Shapiro participated in the fraudulent incorporation and sham ownership of Metro Pain, and he also allowed Moshe to unlawfully operate, control, and profit from Metro Pain.

80.     Shapiro also participated in the fraudulent incorporation and sham ownership of Premier, and he also allowed Moshe to unlawfully operate, control, and profit from Premier.

81.     Shapiro is also responsible for the fraudulent medical billing and fraudulent No-Fault claims that Metro Pain and Premier submitted to Allstate.

### 4.    Nizar Kifaieh, M.D.

82.    Nizar Kifaieh, M.D. ("Kifaieh") resides in and is a citizen of the State of New Jersey.

83.    Kifaieh was licensed to practice medicine in the State of New York and the State of New Jersey during the relevant period.

84.    Kifaieh participated in the fraudulent incorporation and sham ownership of Premier, and he also allowed Moshe to unlawfully operate, control, and profit from Premier.

85.    Kifaieh is also responsible for the fraudulent medical billing and fraudulent No-Fault claims that Premier submitted to Allstate.

### 5.    Yan Moshe a/k/a Yan Leviyev

86.    Yan Moshe a/k/a Yan Leviyev ("Moshe") resides in and is a citizen of the State of New York.

87.    Moshe is not a doctor, and had never been licensed or authorized to provide medical services in the State of New York.

88.    Moshe participated in the operation and management of Metro Pain and Premier. He also controlled Metro Pain's and Premier's operation and finances.

89.    Moshe also owns or controls several ambulatory surgical centers, including non-parties Excel Surgery Center LLC ("Excel"), Hackensack Specialty ASC LLC f/k/a Dynamic Surgery Center LLC ("Dynamic"), Integrated Specialty ASC LLC f/k/a HealthPlus Surgery Center LLC ("HealthPlus"), SCOB LLC d/b/a Surgicare of Brooklyn ("SCOB"), and NJMHMC LLC d/b/a Hudson Regional Hospital ("Hudson Regional") (hereinafter referred to collectively as the "Moshe ASCs").

90.     Moshe caused Metro Pain and Premier to aggressively seek and collect No-Fault payments from Allstate even though Metro Pain and Premier were not eligible for No-Fault reimbursement.

91.     Moshe is also responsible for the fraudulent medical billing and fraudulent No-Fault claims that Metro Pain and Premier submitted to Allstate.

III.    **JURISDICTION AND VENUE**

92.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

93.     Supplemental jurisdiction over Allstate's state law claims is proper pursuant to 28 U.S.C. § 1367.

94.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

95.     Metro Pain conducted business in the State of New York by operating from clinics located in Queens County, Kings County, Nassau County, and Richmond County.

96.     Metro Pain also conducted business in the State of New York by (a) billing for medical services in connection with New York claimants under New York motor vehicle insurance policies issued by Allstate, and (b) referring these New York claimants for injections and other procedures.

97.     Premier conducted business in the State of New York by operating from a facility located in Brooklyn, New York during the relevant period.

98.     Premier also conducted business in the State of New York by billing for medical services in connection with New York claimants under New York motor vehicle insurance policies issued by Allstate.

99.     The Defendants have therefore engaged in purposeful activities in New York by conducting business in New York, and by seeking and collecting payments under New York's No-Fault laws.

100.    The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

101.    The allegations and causes of action asserted herein arise from the Defendants' conduct within the State of New York, and their purposeful availment of New York's No-Fault insurance system, and therefore there is no question that there exists a substantial relationship between the transactions at issue and Allstate's causes of action.

102.    The allegations and claims asserted herein against the Defendants arise from the same series of transactions and occurances, and common questions of law and fact will arise in this action; therefore, the Defendants are properly joined in this matter.

## IV.     APPLICABLE NO-FAULT LAWS AND LICENSING STATUTES

### A.     NEW YORK

#### 1.     New York No-Fault Laws and Regulations

103.    Allstate underwrites automobile insurance in the State of New York.

104.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary medical services.

105.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, "New York's No-Fault laws"), Allstate is required to provide Personal Injury Protection Benefits ("No-Fault benefits") to claimants.

106.   Under the New York's No-Fault laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

107.   "Basic economic loss" is defined to include "all necessary expenses" for medical services.  N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

108.   No-Fault benefits include at least $50,000.00 per Allstate claimant for reasonable expenses that are incurred for necessary medical goods and services.

109.   A patient can assign his/her No-Fault benefits to medical providers, including medical PCs.

110.   Pursuant to a duly executed assignment, a medical provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by New York State Department of Financial Services f/k/a New York State Department of Insurance ("DOI") (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

111.   NF-3 forms are important documents in the insurance industry.  They certify that the provider's request for payment is not materially false, misleading, or fraudulent.   11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

112.   Indeed, the NF-3 forms submitted by medical providers must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime…

N.Y. Ins. Law § 403(d).

113.    A medical provider makes a material misrepresentation when it submits an NF-3 form that either omits or misrepresents material information about the provider's eligibility to seek or collect payment under New York's No-Fault laws.

114.    Misrepresentations and omissions of material fact by a medical provider can take many forms, including false or misleading information about (a) the ownership of a medical PC, or (b) the identity of the actual provider of the service.

115.    Representations about a medical PC's ownership and control are material because New York law requires that all PCs be owned and controlled by appropriately licensed professionals.  *See* N.Y. Bus. Corp. Law §§ 1503, 1507.

116.    Medical providers also make material misrepresentations when they submit NF-3 bills for services that are never provided, or for services that are billed as complex procedures when, in reality, a less complex service was actually provided, if at all.

117.    Moreover, in terms of the fees charged by medical providers, the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("NY Fee Schedule").

118.    The NY Fee Schedule is used by medical providers and insurers to determine the level of reimbursement payable on legitimate claims.

119.    Under Insurance Law § 5102(a)(1), the term "basic economic loss" covers "all necessary expenses incurred for…medical…surgical…physical therapy…[and] any other professional health services."

120.    In determining basic economic loss, the expenses incurred under Insurance Law § 5102(a)(1) "shall be in accordance with the limitations" of Insurance Law § 5108.

121.   Pursuant to Insurance Law § 5108(b), the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating the provisions of [the No-Fault laws] and the workers' compensation law with respect to the charges for the professional health services specified" in Insurance Law § 5102(a)(1), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

122.   The NY Fee Schedule also includes specific "ground rules" that govern the payment of services provided by physician assistants and nurse practitioners.

123.   In particular, the ground rules in effect during the relevant period require that treatment be rendered under a physician's supervision, which means that the physician must be present at least in the same office suite and be immediately available to provide assistance and direction through the time that the physician assistant or nurse practitioner is performing the services.   NYS Workers' Compensation Fee Schedule, Introduction and General Guidelines – General Ground Rules, No. 11.

124.   Under 11 N.Y.C.R.R. § 68.6, titled "Health services performed outside New York State," the amounts reimbursable under New York's No-Fault law are limited based upon, among other things, the residence of the eligible injured person.

125.   The recent amendments to section 68.6, effective January 23, 2018, were intended to "address[] the ongoing exploitation of New York's no-fault system by out-of-state providers who, taking advantage of current provisions in the regulation, submit grossly inflated bills for services rendered, thus quickly depleting the $50,000 no-fault coverage limit available to an eligible injured party ("EIP")."   *See* Assessment of public comments for the Thirty-Third Amendment to 11 N.Y.C.R.R. 68 (Insurance Regulation 83).

126.   The amended version of 11 N.Y.C.R.R. § 68.6 states, in pertinent part, that "if a professional health service reimbursable under Insurance Law section 5102(a)(1) is performed outside [the State of New York] with respect to an eligible injured person that is a resident of [the State of New York], the amount that the insurer shall reimburse for the service shall be the lowest of:

> (1)  the amount of the fee set forth in the region of [the State of New York] that has the highest applicable amount in the fee schedule for that service;
>
> (2)  the amount charged by the provider; and
>
> (3)  the prevailing fee in the geographic location of the provider."

11 N.Y.C.R.R. § 68.6(b).

127.   The previous interation of section 68.6—which was in effect when Moshe devised this scheme—provided that "[i]f a professional health service reimbursable under section 5102(a)(1) of the Insurance Law is performed outside New York State, the permissible charge for such service shall be the prevailing fee in the geographic location of the provider."

128.   As in New York, New Jersey has established a fee schedule ("NJ Fee Schedule") to govern the charges submitted by healthcare providers under New Jersey's No-Fault laws.

129.   Therefore, prior to January 2018, the Defendants were able to purposely exploit the difference in reimbursement rates between the New York and New Jersey fee schedules by sending Metro Pain's New York patients to New Jersey for unwarranted procedures.

130.   Now, under the current version of 11 N.Y.C.R.R. § 68.6, Metro Pain can no longer rely solely on the NJ Fee Schedule when submitting No-Fault claims to Allstate for services billed in New Jersey; however, Metro Pain continues to bill for New Jersey services at unlawfully excessive rates.

131.   As detailed below, Metro Pain was operated in violation of one or more of these New York statutes and regulations.

### 2.   New York Laws Applicable to Professional Healthcare Service Providers

132.   New York's Education Law and Business Corporation Law apply to medical providers, such as physicians and medical PCs.

133.   Providers must fully adhere to these laws—and others—when billing for medical services under New York's No-Fault laws; if they do not, then they are not eligible for No-Fault payments.

134.   New York's No-Fault laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

135.   In New York, only a licensed physician may: (a) practice medicine; (b) own and control a professional service corporation authorized to practice medicine; (c) employ and supervise other physicians; and (d) derive—absent statutory exceptions not applicable in this case—economic benefit from physician services.

136.   New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services.

137.   New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation." It also prohibits such shareholder(s) from entering into any

18

agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

138.   Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

139.   Under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

140.   Under New York Education Law § 6530, it is also professional misconduct for a licensed physician to (a) practice the professional fraudulently, (b) order excessive tests or treatment not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

141.   New York law also requires that foreign medical professional entities operating in New York (a) apply for authority to do business in New York, and (b) obtain a certificate of authority from the New York Department of Education.

142.   Accordingly, foreign medical professional entities that operate in New York without obtaining the requisite certificate of authority and authorization are not eligible to seek or collect No-Fault benefits under New York's No-Fault laws.

143.   In New York, insurers are not precluded from seeking affirmative recovery against individuals and entities that have violated the above statutes and regulations.

144.    In *State Farm Mutual Automobile Insurance Company v. Mallela*, 827 N.E.2d 758 (N.Y. 2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional healthcare services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional healthcare services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement.

145.    When determining a medical provider's reimbursement eligibility under New York's No-Fault laws, insurers are allowed to "look beyond the face of licensing documents to identify willful and material failure to abide by state and local law," such as actual ownership of the practice by an unlicensed individual.  *Mallela*, 827 N.E.2d at 761.

146.    In a recent opinion, the Court of Appeals of New York made clear that *Mallela* does not require a finding of fraud for an insurer to withhold payments to a medical service corporation improperly controlled by non-physicians.  *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 128 N.E.3d 153, 163 (N.Y. 2019) ("A corporate practice that shows 'willful and material failure to abide by' licensing and incorporation statutes may support a finding that the provider is not an eligible recipient of reimbursement under 11 N.Y.C.R.R. § 65-3.16(a)(12) without meeting the traditional elements of common-law fraud." (internal citation omitted)).  Moreover, the Court of Appeals emphasized that the primary consideration in determining a PC's eligibility for No-Fault reimbursement was the "*[c]ontrol* of a professional corporation by nonprofessionals" as opposed to the nonprofessionals' improper fee splitting with the PC.  *Id.* at 164 (emphasis added).

147.   In the matter *Metroscan Imaging, P.C. v. GEICO Insurance Company*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term, 2d Dep't 2006), the court held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

## V.   FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

### A.   HISTORY OF THE DEFENDANTS' FRAUDULENT ACTIVITY

148.   Moshe has a long history of running No-Fault schemes in New York.

149.   Moshe's other schemes targeted No-Fault insurers using illegally-controlled medical providers.  *See*, *e.g.*, *Allstate Ins. Co., et al. v. Ilyaich, et al.*, No. 1:13-cv-05464-NG-LB (E.D.N.Y.); *Liberty Mut. Ins. Co., et al. v. Nexray Medical Imaging, P.C., et al.*, No. 1:12-cv-05666-NGG-VMS (E.D.N.Y.); *Gov't Empls. Ins Co., et al. v. Ushyarov, et al.*, No. 1:11-cv-03657-SJ-SMG (E.D.N.Y.); *Gov't Empls. Ins Co., et al. v. New Hyde Park Imaging, P.C., et al.*, No. 1:11-cv-01166-FB-ALC (E.D.N.Y.); *State Farm Mut. Auto. Ins. Co., et al. v. Bronx Healthcare Medical, P.C., et al.*, No. 2:08-cv-04912-LDW-ARL (E.D.N.Y.); *Travelers Indem. Co. v. Liberty Med. Imaging Assocs., P.C., et al.*, No. 1:07-cv-02519-CPS-JO (E.D.N.Y.); and *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C., et al.*, No. 1:04-cv-05045-ILG-RLM (E.D.N.Y.) .

150.   Moshe's tactics have evolved over time; one of the more recent schemes involves Moshe's illegal operation and control of a hospital and several other surgery centers.  *See Gov't Empls. Ins. Co., et al. v. Yan Moshe a/k/a Yan Leviev, et al.*, No. 1:20-cv-01098 (E.D.N.Y.) (alleging that Moshe sought to "increase his ill-gotten gains" by obtaining a series of ambulatory care facilities, including the Moshe ASCs).

151.   Moshe's litigation history provides important context for understanding this scheme—it helps illustrate the means and motives employed here: Moshe's use of power and

influence over physicians as a means to exploit New York's No-Fault system, and to illegally control and profit from medical service entities.

    **B.**    **THE NEXUS AMONG ALL DEFENDANTS**

152.  Shapiro and Moshe have a longstanding, mutually beneficial business relationship.

153.  Moshe employed Shapiro for various purposes during this scheme: (a) medical director of Moshe's surgery centers; (b) anesthesiologist at Moshe's sister's medical practice; and then (c) chief of anesthesiology at Moshe's hospital.

154.  Moshe and Shapiro met while Moshe was searching for a medical director for one of his New Jersey surgery centers.

155.  Shapiro was eventually hired to be the medical director of Excel.

156.  While working for Excel, Shapiro was also hired to work as an anesthesiologist for a different provider named CitiMed Services, P.A. ("CitiMed Services"), which is a non-party company owned by Moshe's sister—non-party Regina Moshe, M.D.[1]

157.  CitiMed Services employed anesthesiologists, like Shapiro, whose job it was to bill for anesthesia services in connection with procedures conducted at the Moshe ASCs.

158.  Shapiro also served as the medical director for another Moshe ASC named HealthPlus.  He also retained the medical director title when Excel's name was changed to Dynamic

159.  Shapiro later became involved in another new venture when Moshe acquired a hospital named Hudson Regional.

---

[1] Non-party Regina Moshe, M.D. is the purported owner of several medical PCs that are linked to this scheme, including non-parties Citimedical I, PLLC, Citimedical Services P.C., and Citimed Complete Medical Care P.C. According to a recent lawsuit, Moshe secretly owns and controls CitiMed Services and each of the other entities registered under his sister's name and medical license.  *See State Farm Mut. Auto. Ins. Co., et al., v. Yan Moshe (a/k/a Yan Leviev), et al.*, No. 1:21-cv-05523 (E.D.N.Y.).

160.   Shapiro was named Hudson Regional's Chair of Anesthesia on January 1, 2018. Shapiro thereafter left his medical director positions at Dynamic and HealthPlus, and his anthesiologist position at CitiMed Services.

161.   Shapiro incorporated Premier shortly before becoming the Chair of Anesthesia at Hudson Regional.

162.   Upon information and belief, Premier was incorporated to replace CitiMed Services as the billing provider for ansthesia services at Dynamic, HealthPlus, and Hudson Regional.

163.   Moshe, not Shapiro, controlled Premier's operation and finances.

164.   Moshe was able to do this because he wields considerable influence and control over Shapiro, including where Shapiro works, the positions Shapiro holds, and the companies Shapiro supposedly owns.

165.   Moshe's influence and control over Shapiro extends to Metro Pain and Premier, which were actually controlled by Moshe, not Shapiro.

166.   Moshe exerts similar influence and control over Kifaieh.

167.   Like Shapiro, Kifaieh was employed and controlled by Moshe.

168.   Kifaieh was installed as the President and CEO of Moshe's hospital (Hudson Regional).

169.   Moshe used this relationship to substitute Kifaieh for Shapiro as the owner of Premier.

170.   This arrangement enabled Moshe to continue controlling Premier, which, in turn, helped propel Moshe's scheme to maximize No-Fault payments.

171.   Indeed, Premier gave Moshe a new avenue into collecting an even greater portion of the claimants' No-Fault benefits.

172.   Moshe eventually positioned himself to triple-dip into each claimant's available No-Fault coverage—once through Metro Pain (consultations and pain management procedures), a second time through the Moshe ASCs (facility fees), and a third time through Premier (anesthesia services for surgery center procedures).

173.   Moshe's conduct was illegal, and it made Metro Pain and Premier wholly ineligible to seek or collect No-Fault payments.

C.   UNLAWFUL OPERATION OF METRO PAIN

1.   **Moshe's Unlawful Control**

174.   Moshe's scheme required a steady stream of patients.

175.   Moshe also needed doctors to bring patients to his surgery centers for procedures.

176.   The procedures at the surgery centers allowed Moshe—through the Moshe ASCs—to bill for expensive and unwarranted surgical facility fees.

177.   Metro Pain was the perfect vehicle to generate referrals.

178.   Moshe induced Shapiro to incorporate Metro Pain, and then cede control of the company's operation and finances.

179.   In exchange, Moshe placed Shapiro in high-level administrative positions at other companies.

180.   Shapiro was nothing more than Metro Pain's straw owner—Metro Pain was always under Moshe's control.

181.   Shapiro never even provided any actual medical services through Metro Pain.

182.   Shapiro was never compensated by Metro Pain for most of its existence even though he purported to be Metro Pain's only director and shareholder.

183.   Instead, the proceeds of Metro Pain's operation flowed entirely to Moshe.

184.   Financing agreements were utilized to help secure Moshe's control of Metro Pain.

185.     The financing agreements were drawn between Metro Pain and other companies owned by Moshe, such as non-party Med Capital, LLC ("Med Capital").[2]

186.     One of the financing agreements was intended to refinance an existing loan held by Metro Pain, but the agreement was a sham—it was meant to disguise the siphoning of Metro Pain's professional fees and profits, which Moshe accomplished through a usurious rate of interest pegged around 30-40%.

187.     According to Shapiro, the ultimate payoff to Med Capital—and, by extension, Moshe—under this agreement was $800,000.00.

188.     Med Capital itself was a sham entity, which Moshe utilized in connection with his other schemes.  *See*, *e.g.*, Amended Complaint, *Liberty Mut. Ins. Co., et al. v. Nexray Medical Imaging, P.C., et al.*, C.A. No. 1:12-cv-05666-NGG-VMS (E.D.N.Y.) (alleging, among other things, Moshe's unlawful fee splitting through Med Capital).

189.     Metro Pain's "loan" with Med Capital was refinanced, and Metro Pain was caused to enter into another loan agreement with another company controlled by Moshe.

190.     The new loan enabled Moshe's continued depletion and siphoning of Metro Pain's finances.

191.     Metro Pain was later caused to enter into financing agreements with several other companies, including non-parties Lake Success Receivables, Inc., AJ Salvus, Inc., and New Pacific, Inc.

192.     Metro Pain's No-Fault account receivables were pledged as collateral for these financing agreements.

---

[2] Med Capital is owned by Moshe, according to a recent lawsuit filed in this District.  *See State Farm Mut. Auto. Ins. Co., et al., v. Yan Moshe (a/k/a Yan Leviev), et al.*, No. 1:21-cv-05523 (E.D.N.Y.).

193.    The financing companies were structured to look like they were independent from Moshe—they were not.

194.    Moshe has strong ties to the financing companies, particularly non-party Lake Success Receivable Recovery, Inc. f/k/a NY-NJ Receivable Recovery, Inc. ("Lake Success").

195.    Lake Success was incorporated by The Russell Friedman Law Group, LLP ("RFLG"), a law firm that has a long-standing relationship with Moshe.

196.    Lake Success and RFLG share the same address.

197.    RFLG has counseled Moshe for years, and has also represented Moshe and his companies in many of the No-Fault fraud lawsuits referenced above.

198.    The titular head of RFLG—non-party Attorney Russell Friedman ("Friedman")—was also the President of Lake Success.

199.    Friedman also worked for Moshe at Hudson Regional in an executive-level position during the same period.

200.    The financing companies like Lake Success, AJ Salvus, Inc., and New Pacific, Inc. existed so Metro Pain could assign its No-Fault receivables to them.

201.    The financing agreements and related transactions were designed to enrich Moshe—they also enabled Moshe's total control over Metro Pain's finances, and helped conceal Metro Pain's illegal conduct.

## 2.    Unlawful Kickbacks in Exchange for Patient Referrals

202.    Moshe tapped into a network of No-Fault medical clinics with existing patient bases as a means to propel this scheme.

203.   At Moshe's direction, Metro Pain was caused to operate from numerous different medical clinics scattered throughout the Eastern District of New York and elsewhere, including, but not necessarily limited to, the following locations:

- 717 Southern Blvd, Bronx, NY

- 2451 East Tremont Avenue, Bronx, NY

- 520 Beach 20th Street, Far Rockaway, NY

- 9205 Rockaway Blvd, Ozone Park, NY

- 205-07 Hillside Ave, Unit 20, Hollis, NY

- 2273 65th Street, Brooklyn, NY

- 320 Post Ave, Ste 100, Westbury, NY

- 9016 Sutphin Blvd, Jamaica, NY

- 3209 Fulton St, Brooklyn, NY

- 409 Rockaway Ave, Brooklyn, NY

- 87-15 115th St, First Floor, Richmond Hill, NY

- 6937 Myrtle Ave, Ridgewood, NY

- 92-07 Roosevelt Ave, Jackson Heights, NY

- 204-12 Hillside Ave, Hollis, NY

- 105-10 Flatlands Ave, Brooklyn, NY

- 381 Sunrise Highway, Lynbrook, NY

- 9046 Corona Ave, Elmhurst, NY

- 135 Eastern Parkway, Ste 1I, Brooklyn, NY

204.   Patients of these clinics were referred to Metro Pain for pain management evaluations, which resulted in orders for diagnostic testing and interventional pain management procedures.

205.   In many instances, Metro Pain was caused to enter into sublease or licensing agreements with certain medical providers or entities for the use of office space, including office space located at the above-listed locations.

206.   Shapiro did not know about Metro Pain's subleasing or licensing relationships with the clinics, nor could he even recall how Metro Pain was introduced to them.

207.   It was Moshe—not Shapiro—who established relationships with the clinic owners, which gave Metro Pain a chance to operate from the clinics and gain access to a steady stream of patients.

208.   Metro Pain entered into subleasing and licensing agreements at the clinics.

209.   One of the clinics was located at 105-10 Flatlands Avenue in Brooklyn, NY (the "Flatlands Avenue Clinic").

210.   Metro Pain became the Flatlands Avenue Clinic's primary medical provider after the Clinic's previous medical provider—i.e., non-party physician, Azu Ajudua ("Ajudua")—surrendered his medical license after being convicted on felony charges in connection with a medical fraud scheme.

211.   Metro Pain paid monthly "licensing fees" to other providers that operated at the Flatlands Avenue Clinic, such as non-party Starrett City Medical, P.C., which was a fraudulently incorporated medical PC nominally owned by Ajudua until he surrendered his medical license following his felony conviction.

212.   Metro Pain also had a lease agreement with the landlord of the Flatlands Avenue Clinic, which required Metro Pain to pay nearly $10,000 each month to rent the Clinic even though Metro Pain was also making licensing fee payments to Starrett City Medical, P.C. and others.

213.   Metro Pain had similar arrangements with a clinic located at 204-10-12 Hillside Avenue in Hollis, NY (the "Hillside Avenue Clinic").

214.   Metro Pain entered an agreement with the Hillside Avenue Clinic's landlord, which required Metro Pain to pay nearly $10,000 each month to rent space the Clinic.

215.   However, Metro Pain also paid "licensing fees" to other providers at the Hillside Avenue Clinic, such as non-party Hillcrest Medical Care, P.C., which was another fraudulently incorporated medical PC nominally owned by Ajudua until he surrendered his medical license.

216.   In reality, the "licensing fees" were actually illegal kickback payments, which were made in connection with patient referrals.

217.   Notably, both the Flatlands Avenue Clinic and the Hillside Avenue Clinic have been the subject of several civil RICO actions in this District, each of which involve the same illegal conduct alleged here: illegal control of medical PCs, fraudulent medical billing, and unlawful kickback and patient referral payments.  *See Gov't Empls. Ins. Co., et al. v. Azu Ajudua, M.D., et al.*, No. 1:15-cv-05199-MKB-RLM (E.D.N.Y.); *State Farm Mut. Auto. Ins. Co., et al. v. Peter Khaim a/k/a Peter Khaimov, et al.*, No. 1:17-cv-05845-MKB-VMS (E.D.N.Y.); *Allstate Ins. Co., et al. v. Hillcrest Medical Care, P.C., et al.*, No. 1:20-cv-06108-ENV-RER (E.D.N.Y.).

218.   Also, the persons who controlled the Flatlands Avenue Clinic and the Hillside Avenue Clinic have been indicted for healthcare fraud in connection with other schemes involving fraudulent insurance claims and sham financial transactions intended to conceal and launder the

illegal proceeds of their schemes. *See United States v. Peter Khaim, et al.*, 1:20-cr-00580-AMD (E.D.N.Y.); *United States v. Arkadiy Khaimov*, No. 2:20-cr-00267-JMA-AKT (E.D.N.Y.).

219.    Upon information and belief, transportation companies have also been used to carry out this scheme.

220.    The Defendants made arrangements with transportation companies to shuttle patients to-and-from their visits to Metro Pain or to the Moshe ASCs.

221.    Upon information and belief, when the Defendants paid the companies for services, a portion of the funds paid by the Defendants for transportation services were, instead, converted to cash and then paid out as kickback/referral payments.

222.    Overall, the payment of kickbacks in exchange for patient referrals is illegal, and such misconduct made Metro Pain ineligible for payment under New York's No-Fault laws.

### 3.    Shapiro's Failure to Engage in the Practice of Medicine Through Metro Pain

223.    Shapiro never actually provided services through Metro Pain, which demonstrates Shapiro's total lack of control over the PC.

224.    Shapiro had many other positions and obligations during the relevant period making it impossible for him to legitimately own and operate Metro Pain.

225.    Shareholders of medical PCs must actually practice medicine through the medical PC:

> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation . . . or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued . . . All shares issued, agreements made, or proxies granted in violation of this section shall be void.

N.Y. Bus. Corp. Law § 1507.

226.    Metro Pain was operated in violation of New York law because Shapiro never actually practiced medicine through the PC during the relevant period.

227.    Shapiro spent his time elsewhere—usually working for a different Moshe company—thus making it impossible for him to deliver or meaningfully supervise any of the services billed by Metro Pain.

228.    According to a declaration sworn by Moshe on or about June 15, 2020, "Shapiro spent well over 40 hours per week at Excel" as medical director and anesthesiologist as of February 1, 2014, and "[i]t felt as though he was always there."

229.    Shapiro worked in similar roles as medical director and anesthesiologist at other Moshe ASCs prior to taking a position at Hudson Regional as Chair of Anesthesia.

230.    Shapiro also billed for anesthesia services through CitiMed in connection with procedures at Moshe's ASCs.

231.    Moreover, Shapiro is the record owner of several other New Jersey medical PCs, including Neurological Diagnostics P.A., PMR Medical, P.C., and West Hudson Anesthesia P.A. to which Shapiro also dedicated certain amounts of time during the relevant period.

232.    Shapiro also founded and operated a consulting business during the same period named LegalMDConsult.com, which procures and provides "medico-legal documents" for no fault attorneys and healthcare practitioners.

233.    Shapiro's commitments and obligations to all of these other providers and business ventures left him unable to devote any time to Metro Pain.

234.    The scheme, however, was not impeded by Shapiro's absence because Shapiro—by design—was stripped of any meaningful control over Metro Pain.

235.    Shapiro's failure to engage in the practice of medicine through Metro Pain and his failure to supervise the individuals who perform services on behalf of this PC compromised patient care and resulted in Metro Pain's fraudulent medical billing and fraudulent No-Fault claims.

236.    Metro Pain has been ineligible for No-Fault payments at all relevant times because of Shapiro's failure to engage in the practice of medicine through the company.

### D.    UNLAWFUL OPERATION AND CONTROL OF PREMIER

237.    Moshe capitalized on his ownership of surgery centers by forming his own company to bill for anesthesia services that were provided at the centers.

238.    Premier was formed to replace a different anesthesia provider (i.e., CitiMed Services), which was a medical PC purportedly owned by Moshe's sister.

239.    Shapiro and Kifaieh were nothing more than nominal owners of Premier.

### 1.    Moshe's Unlawful Control over Premier

240.    Premier was formed in New Jersey on or about November 4, 2017.

241.    Forming Premier enabled Moshe to bill for anesthesia services provided in connection with surgical procedures performed at his ASCs.

242.    Premier was always under Moshe's control even though it appeared to be—at least facially—owned and controlled by licensed physicians—first Shapiro and then Kifaieh.

243.    Upon information and belief, once incorporated, Shapiro immediately ceded to Moshe all control over Premier's operation, management, and finances.

244.    Shapiro was then appointed the Chair of Anesthesia at Moshe's hospital—just shortly after he helped Moshe organize Premier.

245.    Meanwhile, Moshe used Premier to bill for anesthesia services provided at his ambulatory surgery centers—these were fees that Moshe, as an unlicensed owner of a surgical center, was unble to charge.

246.    Shapiro's ownership of Premier was eventually transferred to Kifaieh, who was the President and CEO of Hudson Regional.

247.    Like Shapiro, Kifaieh served as Premier's nominal owner while also working for Moshe at a different facility.

248.    Kifaieh also ceded to Moshe all control over Premier's operation, management, and finances.

249.    Kifaieh paid nothing to Shapiro in connection with the Premier ownership transfer.

250.    According to Kifaieh, Premier's ownership transfer was facilitated by Hudson Regional's accounting director and general counsel—notably, Hudson Regional is owned by Moshe.

251.    Significantly, Kifaieh further testified that he did not have signatory authority on Premier's corporate bank account and he did not believe that Shapiro had the ability to make transactions on the account when he was the record owner of Premier.

252.    Rather, Moshe's accounting director at Hudson Regional controlled Premier's billing and its corporate bank account, according to Kifaieh.

253.    Moshe's unlawful ownership and control of Premier allowed Moshe to siphon professional fees and profits from Premier.

254.    Because Premier was unlawfully owned and controlled by a non-physician throughout the relevant period, Premier was ineligible to receive No-Fault benefits under New York law.

### 2. Shapiro's and Kifaieh's Failure to Engage in the Practice of Medicine Through Premier

255.    Shapiro and Kifaieh failed to engage in the practice of medicine through Premier.

256.    Shapiro took a new high-ranking position at Moshe's hospital just shortly after Premier was formed, which made it impossible for Shapiro to actually practice medicine through Premier.

257.    Kifaieh also never practiced medicine through Premier; he was occupied as the President and CEO of Moshe's hospital at the same time, and was unable to actually practice medicine through Premier.

258.    According to records submitted by Premier to Allstate, neither Shapiro nor Kifaieh performed any of the anesthesia services billed by Premier during the time that they were listed as the owner of Premier.

259.    Shapiro's and Kifaieh's failure to engage in the practice of medicine through Premier—and their failure to supervise the persons working for Premier—not only violated New York Business Corporation Law § 1507, but it also compromised patient care and resulted in fraudulent medical billing.

### E.    FRAUDULENT BILLING BY METRO PAIN

260.    Metro Pain evaluated as many New York-based patients as possible, and then referred them for pain management procedures at Moshe's surgery centers.

261.    The pain management referrals helped drive this scheme because they generated additional physician fees for Metro Pain, plus additional billing for surgical facility fees and anesthesia services.

262.    Patients were evaluated by a physician or physician assistant that was working under Metro Pain.

263.    The evaluations were just a formality, designed to generate phony support for the pain management referrals.

264.    Initially, Metro Pain did not have a fixed location—instead, providers working for Metro Pain travelled around a circuit of No-Fault clinics so they could bill for patient evaluations and make pain management referrals.

265.    Metro Pain patients were referred for epidural steroid injections ("ESI"), facet joint injections, trigger point injections ("TPI"), and medial branch nerve blocks during the course of this scheme.

266.    The procedures occurred at one of the Moshe ASCs.

267.    Metro Pain billed for the physician services, and the facility fees and anesthesia services were each billed by different companies owned by Moshe.

268.    Over time, Metro Pain opened several different fixed locations—usually they were places where Metro Pain previously operated as a transient provider.

269.    Metro Pain operated differently at the fixed locations: there, Metro Pain acted as the clinic's primary medical provider.

270.    The Defendants knew that the claimants could not be immediately referred for the pain management procedures—Shapiro's own testimony establishes his knowledge that patients must undergo a course of conservative treatment before pain management injections can be ordered and administered.

271.    Metro Pain was re-positioned to be the first provider seen by the patient.

272.    Metro Pain continued evaluating patients and referring them for interventional pain management procedures.

273.    However, Metro Pain first started ordering a course of conservative care, which was intended to create phony support for future pain management procedures.

274. The conservative care was billed by other providers that operated from these clinics, but the arrangements between Metro Pain and the other providers were designed to ensure that the patients were sent back to Metro Pain at the appropriate time (i.e., when the patients "completed" conservative care).

275. Patients were given a follow-up pain management evaluation, and ordered to undergo a pain management procedure, usually an injection.

276. The New York patients were then taken to Moshe's surgery facilities in New Jersey for the procedures.

277. Metro Pain billed for the injections themselves, while the surgery center and an anesthesia provider (e.g., Premier) also billed for surgical facility fees and anesthesia services.

278. As alleged herein, Metro Pain's bills were fraudulent because the services were not medically necessary.

### 1.    **Fraudulent Interventional Pain Management Procedures**

279. For professional healthcare services to be compensable under New York's No-Fault laws, the services must be both medically necessary and causally related to the use or operation of a motor vehicle.

280. The pain management procedures billed by Metro Pain during the relevant period were neither reasonable nor necessary.

281. The procedures also were not causally related to the claimants' purported accidents.

282. The bilateral, multi-level spinal injuries noted in Metro Pain's records are not consistent with a solitary traumatic event, such as a motor vehicle accident.

283. Many of the procedures billed by Metro Pain were designed to treat degenerative conditions, such as arthritis, not post-traumatic injuries.

284.   For instance, facet injections are not used in the treatment of post-traumatic injuries with the exception of compression fractures.

285.   Similarly, medial branch blocks and radiofrequency rhizotomies are not used in the treatment of post-traumatic injuries, but are usually reserved for cases where the patient displays recalcitrant symptoms.

286.   Overall, the pain management procedures billed by Metro Pain involved the treatment of underlying degenerative conditions, which is not covered under No-Fault.

287.   The procedures were also completely unnecessary given the lack of any clinical findings of traumatically induced radiculopathy.

288.   Claimants were given disparate diagnoses—none of which could reasonably be connected to the underlying accident—as a means to bill for additional unnecessary services and to extract the maximum revenue from each patient.

289.   Indeed, in nearly all instances, there is little to no evidence supporting any diagnosis of bona fide traumatic aggravation of underlying facet arthropathy or a herniated disc causally related to the motor vehicle accident in question.

290.   Therefore, Metro Pain's bills for the interventional pain management procedures are fraudulent and not compensable under New York law because the services were not medically necessary and not causally related to the underlying accident.

   2.   **Unlawfully Excessive Charges**

      a.   ***Manipulation of Billing Rules for Out-of-State Services***

291.   Prior to January 2018, providers were allowed to charge the "prevailing fee" in their own geographic location when treating patients eligible for coverage under New York's No-Fault laws.

292. Because New Jersey has a statutory medical fee schedule, the injections billed by Metro Pain at Moshe's New Jersey ASCs were eligible for reimbursement at the rates set forth under the NJ Fee Schedule.

293. Indeed, Metro Pain's New York patients were deliberately sent to New Jersey for services—the Defendants' motives for doing so are illustrated in the chart below:

| Claimant | Claim No. | DOS | Procedure Code | Procedure | Amount Charged by Metro Pain | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| M.P. | 0458387446 | 10/26/17 | 64490-50 64491-50 64492-50 | Bilateral transforaminal epidural block; cervical or thoracic region, one or more level(s) | $742.40 $361.50 $366.74 | $742.40 $362.70 $336.74 | $188.96 $140.87 $140.87 |
| M.P. | 0458387446 | 9/28/2017 | 64493-50 64494-50 64495-50 | Bilateral transforaminal epidural block; lumbar or sacral region, one or more level(s) | $663.78 $328.28 $333.65 | $663.78 $328.28 $333.65 | $188.96 $109.94 $109.94 |
| M.P. | 0458387446 | 9/8/2017 | 62310 | Facet joint injection; cervical or thoracic region | $1,021.73 | $1,021.73 | $396.24 |
| M.P. | 0458387446 | 9/8/2017 | 72275-26, 59 | Epidurography | $182.38 | $182.38 | $146.64 |
| N.G. | 0467176129 | 12/2/2017 | 62310 | Facet joint injection; cervical or thoracic region | $1,021.73 | $1,021.73 | $396.24 |
| N.G. | 0467176129 | 12/2/2017 | 72275-26, 59 | Epidurography | $182.38 | $182.38 | $146.64 |
| M.S. | 0471712141 | 10/26/2017 | 64493-50 64494-50 64495-50 | Bilateral transforaminal epidural block; lumbar or | $663.78 $328.28 $333.65 | $663.78 $328.28 $333.65 | $188.96 $109.94 $109.94 |

| Claimant | Claim No. | DOS | Procedure Code | Procedure | Amount Charged by Metro Pain | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| | | | | sacral region, one or more level(s) | | | |

294.     Metro Pain often more than doubled or even tripled the value of its services by billing them from New Jersey instead of New York.

295.     As explained above, section 68.6(b), as amended, eliminates this incentive for providers to perform healthcare services in New Jersey, as opposed to New York, by only permitting reimbursement under New York No-Fault law at the **lowest** of three (3) rate calculation methods: (1) the amount of the fee set forth in the region of New York that has the highest applicable amount in the fee schedule for that service; (2) the amount charged by the provider; and (3) the prevailing fee in the geographic location of the provider (i.e., the amount permissible under the NJ Fee Schedule).

296.     As illustrated in the chart below, however, even after January 23, 2018, the effective date of the amendments to 11 N.Y.C.R.R. § 68.6, Metro Pain continued billing these services at unlawfully excessive rates:

| Claimant | Claim No. | DOS | Procedure Code | Procedure | Amount Charged by Metro Pain | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| M.B. | 0454839993 | 5/6/2018 | 64633-LT 64634-LT 64634-LT | Left cervical radiofrequency ablation, multiple facet joints | $751.82 $436.29 $436.29 | $751.82 $436.29 $436.29 | $458.08 $137.42 $137.42 |

| Claimant | Claim No. | DOS | Procedure Code | Procedure | Amount Charged by Metro Pain | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| M.B. | 0454839993 | 3/4/2018 | 64490-50 64491-50 64492-50 | Bilateral transforaminal epidural block; cervical or thoracic region, one or more level(s) | $742.40 $361.50 $366.74 | $742.40 $362.70 $366.74 | $188.96 $140.87 $140.87 |
| M.B. | 0454839993 | 3/4/2018 | 20553-xs | Single or multiple trigger point(s), 3 or more muscle(s) | $256.49 | $128.25 | $59.55 |
| M.B. | 0454839993 | 2/4/2018 | 64493-50 64494-50 64495-50 | Bilateral transforaminal epidural block; lumbar or sacral region, one or more level(s) | $663.78 $328.28 $333.65 | $663.78 $328.28 $333.65 | $188.96 $109.94 $109.94 |
| N.G. | 0527038822 | 12/28/2018 | 64493-50 64494-50 64495-50 | Bilateral transforaminal epidural block; lumbar or sacral region, one or more level(s) | $663.78 $328.28 $333.65 | $663.78 $328.28 $333.65 | $188.96 $109.94 $109.94 |
| L.R. | 0508450616 | 11/16/2018 | 64493-50 64494-50 64495-50 | Bilateral transforaminal epidural block; lumbar or sacral region, one or more level(s) | $663.78 $328.28 $333.65 | $663.78 $328.28 $333.65 | $188.96 $109.94 $109.94 |
| L.R. | 0508450616 | 10/11/2018 | 27096-RT | Injection(s), diagnostic or therapeutic agent, paravertebral facet (zygapophyseal) joint (or | $586.47 | $586.47 | $238.20 |

40

| Claimant | Claim No. | DOS | Procedure Code | Procedure | Amount Charged by Metro Pain | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| | | | | nerves innervating that joint) with image guidance (fluoroscopy or CT), cervical or thoracic; single level | | | |
| L.R. | 0508450616 | 9/28/2018 | 64493-RT | Right transforaminal epidural block; lumbar or sacral region, one or more level(s) | $442.52 | $442.52 | $125.97 |
| A.M. | 0491933347 | 10/7/2018 | 64493-50 64494-50 64495-50 | Bilateral transforaminal epidural block; lumbar or sacral region, one or more level(s) | $663.78 $328.28 $333.65 | $663.78 $328.28 $333.65 | $188.96 $109.94 $109.94 |
| A.M. | 0491933347 | 10/19/2018 | 64493-50 64494-50 64495-50 | Bilateral transforaminal epidural block; lumbar or sacral region, one or more level(s) | $663.78 $328.28 $333.65 | $663.78 $328.28 $333.65 | $188.96 $109.94 $109.94 |

297.   Metro Pain's grossly and unlawfully inflated charges for these services are not compensable under New York's No-Fault laws.

**b.    *Fraudulent Unbundling of Charges***

298.   Metro Pain billed Allstate for medical services using Current Procedural Terminology ("CPT") codes.

299.    CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of medical charges by insurance carriers and other private and governmental healthcare payors.

300.    "Unbundling" of CPT codes is another example of a fraudulent and abusive billing tactic.

301.    Unbundling occurs when multiple CPT codes are billed for the component parts of a service when there is a single code available that includes the complete service.

302.    Metro Pain wrongfully unbundled the charges for office visits and injections to increase the amounts billed to Allstate.

i.    *Fraudulent Unbundling of Follow-Up Office Visits*

303.    First, Metro Pain routinely billed for follow-up office visits and injections on the same date of service, including the following examples:

| Claimant | Claim No. | DOS | Procedure Code | Amount Charged |
|---|---|---|---|---|
| A.M. | 0491933347 | 10/7/2018 | 99213 | $85.01 |
| A.M. | 0491933347 | 10/19/2018 | 99213 | $85.01 |
| A.M. | 0491933347 | 1/28/2019 | 99213 | $85.01 |
| L.R. | 0508450616 | 9/7/2018 | 99213 | $85.01 |
| L.R. | 0508450616 | 9/28/2018 | 99213 | $85.01 |
| L.R. | 0508450616 | 10/11/2018 | 99213 | $85.01 |
| L.R. | 0508450616 | 11/16/2018 | 99213 | $85.01 |
| L.R. | 0508450616 | 12/10/2018 | 99213 | $85.01 |
| M.P. | 0458387446 | 9/28/2017 | 99213 | $85.01 |
| M.P. | 0458387446 | 10/5/2017 | 99213 | $85.01 |
| M.P. | 0458387446 | 10/26/2017 | 99213 | $85.01 |
| M.S. | 0471712141 | 10/26/2017 | 99213 | $85.01 |
| M.S. | 0471712141 | 12/15/2017 | 99213 | $85.01 |
| M.B. | 0454839993 | 2/4/2018 | 99213 | $85.01 |
| M.B. | 0454839993 | 2/18/2018 | 99213 | $85.01 |
| M.B. | 0454839993 | 3/4/2018 | 99213 | $85.01 |
| M.B. | 0454839993 | 3/18/2018 | 99213 | $85.01 |
| M.B. | 0454839993 | 5/6/2018 | 99213 | $85.01 |
| M.B. | 0454839993 | 9/8/2017 | 99213 | $85.01 |
| M.B. | 0454839993 | 9/29/2017 | 99213 | $85.01 |

| Claimant | Claim No. | DOS | Procedure Code | Amount Charged |
|----------|-----------|-----|----------------|----------------|
| M.B. | 0454839993 | 11/10/2017 | 99213 | $85.01 |
| M.B. | 0454839993 | 1/7/2018 | 99213 | $85.01 |
| N.G. | 0467176129 | 12/2/2017 | 99213 | $85.01 |
| N.G. | 0467176129 | 1/13/2018 | 99213 | $85.01 |
| N.G. | 0527038822 | 12/14/2018 | 99213 | $85.01 |
| N.G. | 0527038822 | 12/28/2018 | 99213 | $85.01 |
| N.G. | 0527038822 | 2/23/2019 | 99213 | $64.07 |

304.    Metro's Pain's same-day billing for office visits and injections violates Surgery Ground Rule 2 of the NY Fee Schedule, which states "the immediate preoperative visit in the hospital or elsewhere necessary to examine the patient, complete the hospital records and initiate the treatment program is included in the listed value for the surgical procedure."

305.    The office visit charges are already included in the charge for the injection, so Metro Pain was not allowed to charge separately.

306.    Even if the office visit charges were not included in the charges for the injections, there was still no reason for Metro Pain to bill separately for an office visit on the date of the injection because no actual evaluation or management services were rendered—rather, the decision to perform the injections was already made by Metro Pain during a prior visit.

307.    All of Metro Pain's bills for preoperative office visits under CPT code 99213 were fraudulently unbundled and purposely misrepresented, and thus are not compensable under New York's No-Fault laws, including, but not limited to, the charges listed in the chart annexed hereto at Exhibit 1.

ii.    *Outcome Assessment Testing*

308.    Metro Pain fraudulently billed for "outcome assessment testing" under CPT code 99358 in conjunction with follow-up office visits, as demonstrated by the NF-3 bills submitted to Allstate for claimant L.R. (claim no. 0508450616):

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 01/22/19 | 535 UTICA AVENUE Brooklyn NY 11203 | OFFICE/OUTPAT VISIT, EST PAT 25 MINS | 99214 | 92.98 |
| 01/22/19 | 535 UTICA AVENUE Brooklyn NY 11203 | OUTCOME ASSESSMENT TESTING | 99358 | 204.41 |
| | | | TOTAL CHARGES TO DATES | $ 297.39 |

309.    This outcome assessment testing consists of questionnaires, through which the claimants report pain levels and functional abilities.

310.    Metro Pain fraudulently unbundled the charges for this testing because such questionnaires are part and parcel of the evaluation and management services—which are billed under CPT code 99214 in the example above—and cannot be separately charged.

311.    Accordingly, all of Metro Pain's charges for outcome assessment testing under CPT code 99358 are fraudulent and not compensable under New York's No-Fault laws, including the charges listed in the chart annexed hereto at Exhibit 2.

iii.    *Fraudulent Unbundling of Epidurograms*

312.    Metro Pain fraudulently billed for epidurograms in conjunction with ESI, as illustrated by the NF-3 bill submitted to Allstate for claimant N.G. (claim no. 0527038822):

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 12/14/18 | *321 Essex Street Hackensack NJ 07601 | OFFICE/OUTPAT VISIT, EST PAT 15 MINS | 99213 - 25 | 85.01 |
| 12/14/18 | *321 Essex Street Hackensack NJ 07601 | INJECT SPINE L/S (CD) | 62311 | 879.37 |
| 12/14/18 | *321 Essex Street Hackensack NJ 07601 | EPIDUROGRAPHY | 72275 - 26,59 | 182.38 |

313.    An epidurogram is an imaging procedure intended to assist the provider in identifying the correct location to administer the ESI.

44

314.     However, except in certain circumstances not present here, there is no compelling reason to submit separate charges for epidurography because this is a routine procedure that is part and parcel of the ESI procedure (which is already billed by Metro Pain under CPT code 62311 in the example above).

315.     Metro Pain fraudulently unbundled and billed for epidurography under CPT code 72275 in connection with injections; therefore, none of these charges are compensable under New York's No-Fault laws, including, but not limited to, the charges listed in the chart annexed hereto at Exhibit 3.

### 3.     Specific Examples of Fraudulent Billing by Metro Pain

#### a.     *Patient A.A. (claim no. 0491720900)*

316.     A.A. was supposedly involved in a motor vehicle accident on February 11, 2018.

317.     Days later, A.A. began treating at a medical clinic located at 6937 Myrtle Avenue in Glendale, NY.

318.     Metro Pain billed Allstate for an initial examination of A.A., which was purportedly conducted at the 6937 Myrtle Avenue clinic on February 21, 2018.

319.     Metro Pain subsequently billed for several reevaluations of A.A., plus an initial orthopedic evaluation—all encounters were billed by different providers working for Metro Pain.

320.     Metro Pain later billed Allstate for an initial pain management evaluation purportedly performed for A.A. on June 18, 2018.

321.     The report of this June 18, 2018 evaluation ordered a laundry list of pain management procedures, including ESI, facet injections over multiple areas, and TPI.

322.     Several weeks later, Metro Pain billed Allstate for lumbar ESI purportedly performed for A.A. on July 8, 2018 at Dynamic located at 321 Essex St, Hackensack, NJ.

323.   Soon after, on July 22, 2018, Metro Pain billed Allstate for another procedure pertaining to A.A., this time for a cervical ESI at Dynamic.

324.   These ESI procedures billed to Allstate, however, were wholly unnecessary given the lack of clinical findings suggestive of a cervical radiculopathy and the lack of any traumatically induced radiculopathy.

325.   Additionally, Metro Pain fraudulently billed for epidurography under CPT code 72275 in connection with A.A.'s injections.

326.   On August 10, 2018, Metro Pain billed Allstate for the first of a series of medial branch block procedures pertaining to A.A., specifically, a bilateral cervical medial branch nerve block purportedly performed at Dynamic.

327.   Metro Pain subsequently billed Allstate for a right cervical medial branch nerve block purportedly performed for A.A. on August 31, 2018 at Dynamic, despite a recommendation from another Metro Pain provider on August 22, 2018 that A.A. be discharged from treatment.

328.   Metro Pain later billed Allstate for a left lumbar medial branch nerve block purportedly performed for A.A. on September 23, 2018 at Dynamic.

329.   Again, Metro Pain billed Allstate for a bilateral cervical medial branch nerve block purportedly performed for A.A. on November 4, 2018 at Dynamic.

330.   Likewise, Metro Pain again billed Allstate for a bilateral lumbar medial branch nerve block purportedly performed for A.A. on November 18, 2018 at Dynamic.

331.   Such repetitive medial branch blocks are not medically necessary or clinically useful.

332.   Additionally, Metro Pain's records state that A.A. reported "100% pain relief" following the procedures, which is a highly unusual result.

46

333.    Metro Pain also fraudulently billed for office visits under CPT code 99213 in connection with each of these interventional pain management procedures, which were also billed on July 8, 2018, July 22, 2018, August 10, 2018, August 31, 2018, September 23, 2018, November 4, 2018, and November 18, 2018.

334.    Overall, Metro Pain's charges for A.A. are fraudulent and not compensable under New York's No-Fault laws.

**b.    *Patient M.A. (claim no. 0495113110)***

335.    M.A. was involved in an alleged motor vehicle accident on March 13, 2018.

336.    M.A. thereafter commenced treatment at a medical clinic located at 92-07 Roosevelt Avenue in Jackson Heights, NY.

337.    Metro Pain billed Allstate for an initial examination of M.A., which purportedly took place at the 92-07 Roosevelt Avenue clinic on or about April 24, 2018.

338.    M.A. was ordered to undergo certain interventional pain management procedures, including injections to the cervical facets, thoracic facets, and trigger points.

339.    Soon after, Metro Pain billed Allstate for such a procedure at Dynamic on May 6, 2018, namely, a left cervical medial branch nerve block.

340.    Metro Pain again billed Allstate for another left cervical medial branch nerve block that was purportedly performed at Dynamic on June 3, 2018.

341.    Metro Pain subsequently billed Allstate for another interventional pain management procedure, a left cervical radiofrequency ablation of the medial branch nerves, purportedly performed at Dynamic on July 22, 2018.

342.    However, the report of the August 5, 2018 reevaluation of M.A. billed to Allstate by Metro Pain noted that the radiofrequency ablation did not relieve M.A.'s pain.

343.    Metro Pain also billed for an additional bilateral lumbar medial branch block from Dynamic on August 5, 2018.

344.    Additionally, Metro Pain billed for cervical TPI with ultrasound on August 5, 2018, even though the injections and the use ultrasound guidance were both inappropriate and unnecessary.

345.    Subsequently, Metro Pain billed Allstate for a left cervical medial branch block purportedly performed on September 9, 2018 at Dynamic.

346.    None of the medial branch blocks billed by Metro Pain in connection with M.A. were medically necessary or clinically useful.

347.    Metro Pain also fraudulently billed for office visits under CPT code 99213 in connection with each of these interventional pain management procedures, which were also billed on May 6, 2018, June 3, 2018, July 22, 2018, August 5, 2018, and September 9, 2018.

348.    Overall, Metro Pain's charges for M.A. are fraudulent and not compensable under New York's No-Fault laws.

### c.    *Patient M.B. (claim no. 0454839993)*

349.    M.B. was supposedly involved in a motor vehicle accident on May 1, 2017.

350.    M.B. subsequently began treating with providers at a clinic located at 520 Beach 20th Street in Far Rockaway, NY.

351.    Metro Pain began its billing for M.B. with an initial examination, which purportedly took place at the 520 Beach 20th Street on July 25, 2017.

352.    Metro Pain's examination report contains multiple diagnoses that are inconsistent with the expected level of impairment and injury from a solitary motor vehicle accident.

353.    Metro Pain also ordered an extensive regimen of pain management injections, including lumbar ESI.

354.    The lumbar ESI did not relieve M.B.'s pain, according to Metro Pain's reevaluation report.

355.    M.B. showed no evidence of radiculopathy, so no further interventions were reasonable or necessary.

356.    Nonetheless, Metro Pain continued to bill pain management procedures for M.B., including a right lumbar transforaminal ESI purportedly performed at Dynamic on September 29, 2017, and lumbar TPI and cervical ESI also purportedly performed at Dynamic on November 10, 2017.

357.    Metro Pain also fraudulently billed Allstate for epidurography under CPT code 72275 in connection with these ESI procedures.

358.    Moreover, Metro Pain billed Allstate for a bilateral thoracic medial branch block purportedly performed at HealthPlus on January 7, 2018, even though there was no accident-related reason for these injections.

359.    Metro Pain further billed Allstate for a bilateral lumbar medial branch block purportedly performed for M.B. at Dynamic on February 4, 2018 and a bilateral cervical medial branch block purportedly performed for M.B. at Dynamic on February 18, 2018.

360.    The reports for the February 4, 2018 and February 18, 2018 procedures state that M.B. experienced "100% pain relief," which is a highly unusual result.

361.    Further, any facet syndrome suffered by M.B. was not causally related to the underlying motor vehicle accident.

362.     Nonetheless, Metro Pain again billed Allstate for a bilateral cervical medial branch block, as well as lumbar TPI, purportedly performed for M.B. on March 4, 2018 at Dynamic even though Metro Pain reported that M.B.'s chief complaint at that time was right leg pain.

363.     Soon after, Metro Pain billed Allstate for a right cervical radiofrequency ablation purportedly performed at Dynamic on March 18, 2018 and a left cervical radiofrequency ablation purportedly performed at Dynamic on May 6, 2018 even though Metro Pain reported that M.B.'s chief complaints were primarily in the right lower back and leg.

364.     None of the interventional pain management procedures billed by Metro Pain regarding M.B. were medically necessary or related to the underlying accident.

365.     Metro Pain also fraudulently billed for office visits under CPT code 99213 in connection with each of M.B.'s interventional pain management procedures.

366.     Overall, Metro Pain's charges for M.B. are fraudulent and not compensable under New York's No-Fault laws.

### d.     *Patient J.C. (claim no. 0508063476)*

367.     J.C. purportedly was involved in a motor vehicle accident on June 15, 2018.

368.     Days later, J.C. began treating at a medical clinic located at 2451 East Tremont Avenue in Bronx, NY.

369.      Metro Pain billed Allstate for an initial examination of J.C., which purportedly took place at the 2451 East Tremont Avenue clinic on June 21, 2018.

370.     Subsequently, Metro Pain billed Allstate for a follow-up examination of J.C. on July 23, 2018.

371.    Metro Pain also improperly billed Allstate for outcome assessment testing of J.C. on July 23, 2018 by unbundling these charges from the July 23, 2018 evaluation and management service.

372.    Notably, the report for J.C.'s July 23, 2018 outcome assessment testing indicated minimal disability except for very mild findings referable to the neck and back.

373.    Metro Pain then billed Allstate for an initial pain management evaluation of J.C. on August 1, 2018.

374.    Metro Pain ordered multiple interventional pain management procedures for J.C., including TPI, facet injections, and sacroiliac joint injections, as well as possible ESI.

375.    Thereafter, Metro Pain billed Allstate for a follow-up examination of J.C. on August 17, 2018.

376.    Metro Pain also billed for a bilateral lumbar medial branch nerve block purportedly performed for J.C. on August 17, 2018 at Dynamic.

377.    Soon after, Metro Pain billed for another follow-up examination of J.C. on August 23, 2018.

378.    Metro Pain also improperly billed for outcome assessment testing purportedly conducted for J.C. on August 23, 2018 even though such testing was already part of the follow-up examination and could not be unbundled and billed separately.

379.    The services billed by Metro Pain for J.C. were not reasonable, appropriate, or causally related to the underlying accident.

380.    Therefore, Metro Pain's charges for J.C. are fraudulent and not compensable under New York's No-Fault laws.

e.     *Patient N.G. (claim no. 0467176129)*

381.     N.G. was involved in an alleged motor vehicle accident on July 16, 2017.

382.     That same day, N.G. began treating at a medical facility located at 105-10 Flatlands Avenue in Brooklyn, NY.

383.     N.G. was referred for a pain consultation, which was billed by Metro Pain.

384.     Metro Pain's consultation purportedly took place at the 105-10 Flatlands Avenue clinic on October 10, 2017.

385.     Metro Pain subsequently charged Allstate for a follow-up examination and cervical ESI purportedly conducted at HealthPlus on December 2, 2017.

386.     Metro Pain again charged Allstate for a follow-up examination and lumbar ESI purportedly conducted at HealthPlus on January 13, 2018.

387.     Metro Pain's bills for the services purportedly performed on December 2, 2017 and January 13, 2018 included charges for the follow-up examinations, as well as epidurograms under CPT code 72275, that were improperly unbundled from the ESI procedures.

388.     Once more, Metro Pain charged Allstate for a wrongfully unbundled follow-up examination immediately preceding cervical medial branch nerve blocks purportedly conducted at Dynamic on February 24, 2017.

389.     Metro Pain also wrongfully billed Allstate for outcome assessment testing that was purportedly performed regarding N.G. on January 17, 2018 and February 23, 2018 by unbundling these charges from the evaluation and management services purportedly rendered on the same dates.

390. The treatment billed by Metro Pain was neither reasonable nor appropriate based upon the mechanism of N.G.'s purported injuries and because there was a lack of objective findings.

391. There was simply no reason for the injections—nothing in N.G.'s subjective symptoms, objective findings, or responses to other tests and treatments supports these invasive services.

392. Therefore, Metro Pain's charges for N.G. are fraudulent and not compensable under New York's No-Fault law.

**f.** ***Patient M.P. (claim no. 0458387446)***

393. M.P. supposedly was involved in a motor vehicle accident on May 29, 2017.

394. The next day, M.P. began treating at a medical facility located at 150 Graham Avenue in Brooklyn, NY.

395. Metro Pain billed Allstate for an initial evaluation of M.P., which purportedly took place at the 150 Graham Avenue clinic on September 8, 2017.

396. Metro Pain's report recommended numerous pain management procedures involving the cervical spine, lumbar spine, sacroiliac joint, and thoracic facet joints, as well as TPI.

397. Metro Pain then billed for one such procedure, a cervical ESI, purportedly performed for M.P. that very same day on September 8, 2017 at Dynamic, including improperly unbundled charges for an epidurogram.

398. Not long after, Metro Pain billed for another pain management procedure, a bilateral lumbar medial branch nerve block, purportedly performed for M.P. on September 28, 2017 at Dynamic.

399.    Metro Pain also billed for a follow-up examination purportedly preceding this medial branch block that was improperly unbundled from the charges for this procedure; indeed, the decision to perform the pain management procedure purportedly was made during the September 8, 2017 consultation.

400.    According to the operative report submitted to Allstate regarding this September 28, 2017 procedure, M.P. reported "100% pain relief" following the procedure, which is a highly unusual result.

401.    Metro Pain again fraudulently billed Allstate for an unbundled follow-up examination and an additional interventional procedure—this time a bilateral thoracic medial branch nerve block—purportedly performed for M.P. at Dynamic on October 5, 2017.

402.    Metro Pain then fraudulently charged Allstate for an unbundled follow-up examination and yet another interventional procedure—a bilateral cervical medial branch nerve block—purportedly performed for M.P. at Dynamic on October 26, 2017.

403.    According to the operative report submitted to Allstate regarding this October 26, 2017 procedure, M.P. reported atypical "100% pain relief" following the procedure.

404.    Metro Pain then billed for yet another bilateral thoracic medial branch nerve block, for M.P. at Dynamic on November 9, 2017 even though multiple repetitive medial branch blocks are not useful clinically.

405.    None of the interventions billed for by Metro Pain were reasonable, appropriate, or related to any injuries potentially sustained in the underlying motor vehicle accident.

406.    Therefore, Metro Pain's charges for M.P. are fraudulent and not compensable under New York's No-Fault law.

g.     *Patient L.R. (claim no. 05084450616)*

407.    L.R. purportedly was involved in a motor vehicle accident on June 22, 2018.

408.    The very same day, L.R. started treating at a clinic located at 535 Utica Avenue in Brooklyn, NY.

409.    Metro Pain billed Allstate for an initial examination of L.R., which purportedly took place at the 535 Utica Avenue clinic on June 22, 2018.

410.    Metro Pain ordered several consultations, including a pain consultation.

411.    Metro Pain subsequently billed Allstate for a follow-up examination that purportedly took place on July 17, 2018.

412.    Metro Pain also submitted charges to Allstate for a neurological consultation regarding L.R. that was purportedly conducted on August 1, 2018.

413.    Metro Pain further billed for electrodiagnostic studies purportedly performed for L.R. on that same day of August 1, 2018.

414.    Subsequently, Metro Pain billed for an initial pain management evaluation of L.R. that purportedly took place on August 15, 2018.

415.    Soon after, Metro Pain submitted additional charges to Allstate for a follow-up examination purportedly performed as to L.R. on August 21, 2018.

416.    Metro Pain's report for this August 21, 2018 follow-up examination ordered an orthopedic evaluation for L.R.

417.    However, Metro Pain next billed Allstate for a follow-up pain management evaluation on September 7, 2018.

418.    The report submitted to Allstate by Metro Pain regarding the September 7, 2018 pain management evaluation ordered several more services, including cervical and lumbar facet injections, lumbar ESI, and TPI.

419.    Indeed, Metro Pain also billed Allstate for a lumbar ESI purportedly rendered to L.R. at Dynamic that same day on September 7, 2018, including improperly unbundled charges for an epidurogram in connection with this ESI procedure.

420.    Thereafter, Metro Pain again billed Allstate for an additional follow-up pain management evaluation that purportedly took place on September 28, 2018.

421.    The report submitted to Allstate by Metro Pain regarding the September 28, 2018 pain management evaluation again ordered multiple interventional techniques, including cervical and lumbar facet injections, lumbar ESI, and TPI.

422.    Metro Pain also billed Allstate for a right lumbar medial branch nerve block purportedly rendered to L.R. on September 28, 2018 at Dynamic.

423.    Metro Pain again billed Allstate for a follow-up examination that purportedly took place on October 4, 2018.

424.    The report for this October 4, 2018 follow-up examination submitted to Allstate by Metro Pain ordered orthopedic, neurological, and pain management consultations.

425.    Thereafter, Metro Pain billed Allstate for two (2) follow-up pain management evaluations that purportedly took place on October 10, 2018 and October 11, 2018.

426.    Following these evaluations, Metro Pain ordered several more interventional pain management procedures, including cervical and lumbar facet injections, lumbar ESI, sacroiliac joint injections, and TPI.

427.    Additionally, Metro Pain also billed Allstate for a right sacroiliac joint injection and lumbar TPI purportedly performed for L.R. at HealthPlus on October 11, 2018.

428.    Metro Pain billed Allstate for another follow-up pain management evaluation for L.R. purportedly taking place on November 5, 2018.

429.    Metro Pain yet again ordered even more interventional pain management procedures following the evaluation, including cervical and lumbar facet injections, lumbar ESI, sacroiliac joint injections, and TPI.

430.    Metro Pain submitted charges to Allstate for an additional follow-up pain management evaluation purportedly rendered as to L.R. on November 16, 2018.

431.    The report submitted to Allstate regarding this November 16, 2018 follow-up examination ordered the same interventional pain management procedures recited in the reports corresponding to the October 10, 2018 and October 11, 2018 follow-up examinations billed to Allstate by Metro Pain.

432.    Metro Pain also billed Allstate for a bilateral lumbar medial branch nerve block purportedly perfomed for L.R. on November 16, 2018 at HealthPlus.

433.    Therefore, Metro Pain wrongfully billed for an unbundled office visit in connection with the November 16, 2018 injections.

434.    Metro Pain billed Allstate for another follow-up examination of L.R. on December 6, 2018.

435.    The report submitted to Allstate by Metro Pain regarding this December 6, 2018 follow-up examination again ordered orthopedic, neurological, and pain management consultations.

436.    Metro Pain then billed Allstate for a follow-up pain management evaluation of L.R. purportedly performed on December 10, 2018.

437.    The report submitted to Allstate by Metro Pain regarding this December 10, 2018 evaluation again ordered the same procedures cited in previous reports, specifically, the use of multiple interventional techniques, including cervical and lumbar facet injections, lumbar ESI, sacroiliac joint injection, and TPI.

438.    Metro Pain also billed Allstate for an endoscopic dorsal ramus right lumbar medial branch rhizotomy purportedly performed as to L.R. on December 10, 2018 at Hudson Regional, as well as improperly unbundled charges for a follow-up visit under CPT code 99213.

439.    Metro Pain billed Allstate for yet another follow-up pain management evaluation of L.R. purportedly taking place on December 24, 2018.

440.    The report submitted to Allstate corresponding to this December 24, 2018 evaluation repeated the same diagnoses and recommended procedures listed in the report regarding the previous December 10, 2018 follow-up evaluation.

441.    Metro Pain billed for an additional follow-up pain management evaluation purportedly provided for L.R. on January 10, 2019.

442.    The report submitted by Metro Pain to Allstate regarding this January 10, 2019 evaluation again ordered procedures listed in previous evaluation reports, and discussed potential future additional ESI.

443.    Metro Pain further billed Allstate for another follow-up examination of L.R. purportedly taking place on January 22, 2019.

444.    The report submitted to Allstate regarding this January 22, 2019 evaluation recommended no further treatment.

445. Indeed, the report of the outcome assessment testing purportedly completed for L.R. on January 22, 2019—for which Metro Pain submitted charges that were improperly unbundled from the charges for the follow-up examination—revealed that L.R. was experiencing no back problems and only very mild neck issues as of this date.

446. Overall, Metro Pain billed for a vast array of unnecessary and unwarranted services in connection with L.R., including seventeen (17) examinations over the course of approximately six (6) months—none of this was reasonable or appropriate.

447. Therefore, Metro Pain's charges for L.R. are fraudulent and not compensable under New York's No-Fault law.

### h. *Patient V.W. (claim no. 0522634765)*

448. V.W. was involved in an alleged motor vehicle accident on October 30, 2018.

449. That same day, V.W. started treating at a medical facility located at 1200 East New York Avenue in Brooklyn, NY.

450. Metro Pain billed Allstate for an initial medical examination of V.W., which purportedly took place at the 1200 East New York Avenue clinic on October 31, 2018.

451. Subsequently, Metro Pain billed Allstate for an initial orthopedic evaluation purportedly performed for V.W. on November 19, 2018 to address V.W.'s reported shoulder pain.

452. V.W. was ordered to undergo left shoulder arthroscopic surgery following the November 19, 2018 orthopedic examination, which V.W. submitted to in December 2018.

453. Metro Pain billed Allstate for a follow-up examination purportedly rendered of V.W. on November 28, 2018.

454. Metro Pain then billed Allstate for an initial neurological consultation purportedly rendered to V.W. on December 5, 2018.

455. According to the report of the initial neurological consultation purportedly rendered on December 5, 2018, V.W. was ordered to undergo a pain management evaluation, which was billed by Metro Pain that same day.

456. The report of the December 5, 2018 pain management evaluation ordered a number of pain management procedures, including cervical, thoracic, and lumbar facet steroid injections, sacroiliac joint steroid injection, and TPI.

457. Metro Pain also billed for electrodiagnostic testing purportedly performed regarding V.W. on December 5, 2018.

458. The repeated evaluations of V.W. by Metro Pain were excessive and medically unnecessary.

459. Indeed, the providers purportedly treating V.W. during the relevant period, including Metro Pain, offered multiple diagnoses as to V.W. even though there was insufficient evidence to support these diagnoses; indeed, the diagnostic materials submitted to Allstate regarding V.W. revealed no evidence of traumatic nexus to the underlying motor vehicle accident.

460. Therefore, Metro Pain's charges for V.W. are fraudulent and not compensable under New York's No-Fault law.

F.  **FRAUDULENT MEDICAL BILLING BY PREMIER**

461. Premier billed Allstate for anesthesia services that were medically unnecessary and falsely charged.

1.  **Fraudulent Anesthesia Services**

462. Premier billed for intravenous (IV) sedation during procedures at Moshe's ASCs.

463. Premier's records describe the services as monitored anesthesia "including injections into the intravenous lines, breathing by facemask, or by other means, producing a semi-conscious state."

464. Monitored anesthetic care (MAC) is defined by the American Society of Anesthesiologists (ASA) as a specific anesthesia service performed by a qualified anesthesia provider—as opposed to the provider performing the underlying procedure—for a diagnostic or therapeutic procedure.

465. MAC is administered where there is a potential for loss of airway or cardiovascular function due to deep sedation.

466. Therefore, during MAC, the anesthesia provider is focused exclusively and continuously on the patient for the purpose of identifying any adverse responses and intervening if necessary.

467. For instance, patients sedated with propofol, a short-acting sedative-hypnotic agent, may rapidly progress to a state of deep sedation or general anesthesia.

468. Moreover, even at low doses, propofol can caused decreased oxygen levels, increased carbon dioxide levels, and inhibit airway reflexes.

469. As such, propofol sedation is not appropriate for most interventional pain management procedures and should be avoided.

470. Indeed, MAC is not necessary and is contra-indicated for almost all interventional pain management procedures, including trigger point injections, facet injections, sacroiliac joint injections, and ESI.

471.    Rather, local anesthesia only is indicated for interventional procedures, and many patients can undergo interventional pain procedures without the need for supplemental sedation in addition to local anesthesia.

472.    According to the ASA, procedures that typically do not require sedation include ESI, trigger point injections, facet joint injections, and sacroiliac joint injections.

473.    Likewise, according to the Spine Intervention Society (SIS), sedation is not intrinsically necessary for interventional pain management procedures, such as ESIs and facet joint injections; in fact, sedation should be employed on a case-by-case basis and only in unique circumstances, such as when a patient has a movement disorder, extreme anxiety, or previous vasovagal response.

474.    Patients must remain able to communicate pain or other adverse sensations or events during such procedures.

475.    For instance, spinal ESI involve the potential risk for direct needle injury to the spinal cord, which injury may go unnoticed in a deeply sedated patient who cannot perceive or communicate the tingling or burning sensations accompanied by needle contact with the spinal cord.

476.    Moreover, Premier regularly purported to intravenously administer unnecessary and unreasonable anesthetic agents such as propofol and lidocaine to Allstate claimants, which carry increased risks for seizure, cardiac arrhythmia, and respiratory suppression.

477.    Premier's routine and unwarranted use of MAC in connection with the interventional pain management procedures was both dangerous and irresponsible, and it exposed the patients to unnecessary safety risks associated with MAC.

478.     Therefore, the IV sedation services billed to Allstate by Premier in connection with interventional pain-management procedures were medically unnecessary, and thus are not compensable under New York's No-Fault laws.

### 2.     Unlawfully Excessive Billing By Premier

479.     As explained above, Moshe was motivated to bring New York patients to his New Jersey surgery centers to inflate the charges submitted to Allstate.

480.     By controlling Premier, Moshe was able to take further advantage of New York's No-Fault laws.

481.     Premier submitted excessive charges to Allstate after January 2018 that did not comply with applicable New York law.

482.     As explained above, charges submitted for services rendered out of state for New York residents after January 2018 under New York's No-Fault laws must comply with 11 N.Y.C.R.R. § 68.6 by using the lowest amount derived from one three (3) rate calculation methods: (1) the amount of the fee set forth in the region of New York that has the highest applicable amount in the fee schedule for that service; (2) the amount charged by the provider; and (3) the prevailing fee in the geographic location of the provider (i.e., the amount permissible under the NJ Fee Schedule).

483.     However, as illustrated in the chart below, Premier routinely submitted charges for services rendered in New Jersey to New York-based patients after January 2018 that were in gross excess of the amount permitted to be charged under New York law.

| Claimant | Claim No. | DOS | Procedure Code | Service | Amount Charged by Premier | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| A.M. | 0491933347 | 10/7/2018 | 01992-AA;P1 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,350.00 | $484.23 | $162.06 |
| A.M. | 0491933347 | 10/19/2018 | 01992-AA;P1 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,350.00 | $501.53 | $162.06 |
| A.M. | 0491933347 | 1/28/2019 | 01936-AA;QS;P1 | Anesthesia for percutaneous image guided procedures on the spine and spinal cord; therapeutic | $7,800.00 | $1,115.46 | $351.13 |
| L.R. | 0508450616 | 9/7/2018 | 01992-AA;P1 | Anesthesia for diagnostic or therapeutic nerve blocks and | $1,350.00 | $492.88 | $162.06 |

| Claimant | Claim No. | DOS | Procedure Code | Service | Amount Charged by Premier | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| | | | | injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | | | |
| L.R. | 0508450616 | 9/28/2018 | 01992-AA;P1 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,350.00 | $501.53 | $162.06 |
| L.R. | 0508450616 | 10/11/2018 | 01992-AA;P2 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,575.00 | $588.00 | $189.07 |
| L.R. | 0508450616 | 11/16/2018 | 01992-AA;P1 | Anesthesia for diagnostic or | $1,350.00 | $510.17 | $162.06 |

| Claimant | Claim No. | DOS | Procedure Code | Service | Amount Charged by Premier | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| | | | | therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | | | |
| L.R. | 0508450616 | 12/10/2018 | 01936-AA;P1 | Anesthesia for percutaneous image guided procedures on the spine and spinal cord; therapeutic | $9,600.00 | $1,314.34 | $432.16 |
| M.B. | 0515316123 | 1/9/2019 | 01400-AA;QS;P1 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $5,000.00 | $830.11 | $189.07 |
| M.F. | 0485020168 | 3/14/2018 | 01630-AA;QS;P1 | Anesthesia for open or surgical arthroscopic procedures on humeral head and neck, | $778.23 | $760.94 | $243.09 |

| Claimant | Claim No. | DOS | Procedure Code | Service | Amount Charged by Premier | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| | | | | sternoclavicular joint, acromioclavicular joint, and shoulder joint; not otherwise specified | | | |
| M.F. | 0485020168 | 3/14/2018 | 64415-59 | Injection(s), anesthetic agent(s) and/or steroid; brachial plexus | $304.42 | $304.42 | $155.75 |
| M.F. | 0485020168 | 8/18/2018 | 01992-AA;P2 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,350.00 | $501.53 | $162.06 |
| M.F. | 0485020168 | 10/6/2019 | 01992-AA;P1 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,350.00 | $475.86 | $162.06 |

| Claimant | Claim No. | DOS | Procedure Code | Service | Amount Charged by Premier | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| N.G. | 0527038822 | 12/14/2018 | 01992-AA;P2 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,350.00 | $484.23 | $162.06 |
| N.G. | 0527038822 | 12/28/2018 | 01992-AA;P1 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,350.00 | $510.17 | $162.06 |
| N.G. | 0527038822 | 2/23/2019 | 01992-AA;P2 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care | $1,350.00 | $527.47 | $189.04 |

| Claimant | Claim No. | DOS | Procedure Code | Service | Amount Charged by Premier | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| | | | | professional); prone position | | | |
| W.A. | 0491883823 | 7/18/2018 | 01992-AA;P1 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,575.00 | $553.41 | $189.07 |
| W.A. | 0491883823 | 7/25/2018 | 01992-AA;P2 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,575.00 | $596.64 | $189.07 |
| W.A. | 0491883823 | 8/8/2018 | 01992-AA | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other | $1,350.00 | $510.17 | $162.06 |

| Claimant | Claim No. | DOS | Procedure Code | Service | Amount Charged by Premier | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| | | | | qualified health care professional); prone position | | | |
| W.A. | 0491883823 | 9/25/2018 | 01992-AA;P2 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,575.00 | $536.11 | $189.07 |
| W.A. | 0491883823 | 10/23/2018 | 01992-AA;P2 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different physician or other qualified health care professional); prone position | $1,350.00 | $527.47 | $189.07 |
| W.A. | 0491883823 | 10/30/2018 | 01992-AA;P2 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a | $1,575.00 | $596.64 | $189.07 |

| Claimant | Claim No. | DOS | Procedure Code | Service | Amount Charged by Premier | Maximum Amount Allowed under NJ Fee Schedule | Maximum Amount Allowed under NY Fee Schedule |
|---|---|---|---|---|---|---|---|
| | | | | different physician or other qualified health care professional); prone position | | | |

484.     Therefore, Premier's billing for New Jersey-based services after January 2018 were grossly and unlawfully inflated, and thus are not compensable under New York's No-Fault laws.

**3.     Specific Examples of Fraudulent Billing By Premier**

**a.     *Patient W.A. (claim no. 0491883823)***

485.     W.A. was involved in an alleged motor vehicle accident on February 14, 2018.

486.     On July 18, 2018, July 25, 2018, and August 8, 2018, W.A. purportedly underwent bilateral lumbar facet block injections at the L2-L3, L3-L4, and L4-L5 levels and bilateral sacroiliac joint injections at HealthPlus.

487.     On September 25, 2018 and October 30, 2018, W.A. again purportedly underwent bilateral lumbar facet block injections at the L2-L3, L3-L4, and L4-L5 levels and bilateral sacroiliac joint injections at Dynamic, in addition to TPIs in the cervical occipital area.

488.     Additionally, on October 23, 2018, W.A. purportedly underwent bilateral cervical facet block injections at the C5-C6, C6-C7, and C7-CT1 levels at Dynamic.

489.     Not only were the injections themselves medically unnecessary and improper, but Premier also billed Allstate separately for medically unnecessary and unreasonable monitored

anesthesia services in connection with each of the injections that were billed on July 18, 2018, July 25, 2018, August 8, 2018, September 25, 2018, October 23, 2018, and October 30, 2018.

490.    Premier also billed excessive amounts ranging from $1,350.00 to $1,575.00 for the unnecessary anesthesia services.

491.    Sedation simply was not necessary for any of the injections, and Premier's additional billing for these anesthesia services recklessly created an additional—and utterly needless—risk of significant complications.

492.    Therefore, Premier's charges for W.A. are fraudulent and not compensable under New York's No-Fault laws.

**b.    *Patient S.G. (claim no. 0518362199)***

493.    S.G. was involved in an alleged motor vehicle accident on September 24, 2018.

494.    Metro Pain billed Allstate for an initial medical examination of S.G. on January 10, 2019, as well as follow-up visits on January 25, 2019, February 15, 2019, and March 16, 2019.

495.    On January 25, 2019, S.G. purportedly underwent a lumbar ESI with an epidurogram at Dynamic.

496.    On February 15, 2019, S.G. purportedly underwent a cervical ESI with an epidurogram at Dynamic.

497.    On March 16, 2019, S.G. purportedly underwent a bilateral thoracic medial branch nerve block at the T8, T9, T10, and T11 levels at Dynamic.

498.    Not only were the injections themselves medically unnecessary and improper, but Premier also billed Allstate separately for medically unnecessary and unreasonable monitored anesthesia services in connection with each of the injections that were billed on January 25, 2019, February 15, 2019, and March 16, 2019.

499.    Premier also billed excessive amounts of $1,350.00 for the unnecessary anesthesia services.

500.    Premier's use of heavy sedation (e.g., IV propofol, lidocaine, and fentanyl) was not necessary for any of the injections, and Premier's additional billing for these anesthesia services recklessly created an additional—and utterly needless—risk of significant complications.

501.    Therefore, Premier's charges for S.G. are fraudulent and not compensable under New York's No-Fault laws.

### c.    *Patient N.G. (claim no. 0527038822)*

502.    N.G. was involved in an alleged motor vehicle accident on October 31, 2018.

503.    Metro Pain billed Allstate for an initial medical examination of N.G. on December 4, 2018, as well as follow-up visits on December 14, 2018, December 28, 2018, and February 23, 2019.

504.    On December 14, 2018, N.G. purportedly underwent a lumbar ESI and epidurogram at Dynamic.

505.    On December 28, 2018, N.G. purportedly underwent a bilateral lumbar medial branch nerve block at the L3, L4, and L5 levels at Dynamic.

506.    On February 23, 2018, N.G. purportedly underwent a bilateral cervical medial branch nerve block at the C3, C4, and C5 levels at Dynamic.

507.    Not only were the injections themselves medically unnecessary and improper, but Premier also billed Allstate separately for medically unnecessary and unreasonable monitored anesthesia services in connection with each of the injections that were billed on December 14, 2018, December 28, 2018, and February 23, 2019.

508. Premier also billed excessive amounts of $1,350.00 for the unnecessary anesthesia services.

509. Sedation (e.g., IV propofol and lidocaine) simply was not necessary for any of the injections, and Premier's additional billing for these anesthesia services recklessly created an additional—and utterly needless—risk of significant complications

510. Therefore, Premier's charges for N.G. are fraudulent and not compensable under New York's No-Fault laws.

### d. *Patient A.L. (claim no. 0512907932)*

511. A.L. was involved in an alleged motor vehicle accident on August 3, 2018.

512. Metro Pain billed Allstate for initial medical examinations of A.L. on August 8, 2018 and September 6, 2018, as well as for follow-up examinations on September 20, 2018, October 26, 2018, and January 4, 2019.

513. On October 26, 2018, A.L. purportedly underwent a lumbar ESI at Dynamic.

514. On January 4, 2018, A.L. purportedly underwent a bilateral lumbar medial branch nerve block at the L3, L4, and L5 levels at Dynamic.

515. Not only were the injections themselves medically unnecessary and improper, but Premier also billed Allstate separately for medically unnecessary and unreasonable monitored anesthesia services in connection with each of the injections that were billed on October 26, 2018 and January 4, 2019.

516. Premier also billed excessive amounts of $1,350.00 for the unnecessary anesthesia services.

517. Premier's use of heavy sedation (e.g., IV propofol and lidocaine) was not necessary for any of the injections, and Premier's additional billing for these anesthesia services recklessly created an additional—and utterly needless—risk of significant complications.

518. Therefore, Premier's charges for A.L. are fraudulent and not compensable under New York's No-Fault laws.

**e.     *Patient A.M. (claim no. 0491933347)***

519. A.M. was involved in an alleged motor vehicle accident on February 15, 2018.

520. Metro Pain billed Allstate for an initial evaluation of A.M. on August 24, 2018, as well as for follow-up visits on October 7, 2018, October 19, 2018, and January 28, 2019.

521. On October 7, 2018 and October 19, 2018, A.M. purportedly underwent bilateral lumbar medial branch nerve blocks at the L3, L4, and L5 levels at Dynamic.

522. Not only were the injections themselves medically unnecessary and improper, but Premier also billed Allstate separately for medically unnecessary and unreasonable monitored anesthesia services in connection with each of the injections that were billed on October 7, 2018 and October 19, 2018.

523. The entire procedures themselves are questionable in light of A.M.'s supposed reports of "100% pain relief" from these medial branch nerve blocks, which is a highly unusual result.

524. Premier also billed excessive amounts of $1,350.00 for the unnecessary anesthesia services.

525. Then, on January 28, 2019, A.M. purportedly underwent a bilateral endoscopic dorsal ramus medial branch rhizotomy at the L3-4, L4-5, and L5-S1 levels at Moshe's hospital (i.e., Hudson Regional).

526.    Not only was the procedure medically unnecessary, but Premier billed Allstate for dangerous general anesthesia care in connection with this procedure.

527.    Specifically, Premier billed Allstate in the excessive amount of $7,800.00 for general anesthesia purportedly administered to A.M. on January 28, 2019 in connection with this unnecessary endoscopic rhizotomy procedure.

528.    Therefore, Premier's charges for A.M. are fraudulent and not compensable under New York's No-Fault law.

**f.    *Patient T.N. (claim no. 0504456286)***

529.    T.N. was involved in an alleged motor vehicle accident on May 16, 2018.

530.    T.N. purportedly underwent chiropractic manipulations of the spine performed under anesthesia on August 9, 2018 at HealthPlus and on August 23, 2018 and September 6, 2018 at Dynamic.

531.    Manipulation under anesthesia (MUA) of the spinal elements is a highly risky, ineffective, and generally medically unnecessary procedure.  Nevertheless, Premier billed Allstate for medically unnecessary and inappropriate monitored anesthesia care (including IV propofol and lidocaine) in connection with these already unnecesary MUA procedures, which subjected T.N. to even greater risk of harm or other significant complications.

532.    Additionally, Metro Pain billed for an initial evaluation of T.N. on September 5, 2018 and ordered numerous interventional pain management procedures, including ESI, facet injections, and TPI.

533.    On October 19, 2018, November 29, 2018 and December 27, 2018, T.N. purportedly had a series of pain management injection procedures at Dynamic.

534.     Not only were the injections themselves medically unnecessary and improper, but Premier also billed Allstate separately for medically unnecessary and unreasonable monitored anesthesia services in connection with each of the injections that were billed on October 19, 2018, November 29, 2018 and December 27, 2018.

535.     Premier also billed excessive amounts of $1,350.00 for the unnecessary anesthesia services in connection with these already unwarranted injections.

536.     Premier's use of heavy sedation (e.g., IV propofol and lidocaine) was not necessary for any of the injections, and Premier's additional billing for these anesthesia services recklessly created an additional—and utterly needless—risk of significant complications.

537.     Therefore, Premier's charges for T.N. are fraudulent and not compensable under New York's No-Fault law.

### g.      *Patient L.R. (claim no. 0508450616)*

538.     L.R. was involved in an alleged motor vehicle accident on June 22, 2018.

539.     Metro Pain billed Allstate for an initial evaluation of L.R. on August 15, 2018.

540.     Metro Pain ordered numerous interventional pain management procedures for L.R., including facet injections, ESI, and TPI.

541.     The procedures were billed on September 7, 2018, September 28, 2018, October 11, 2018, November 16, 2018, and December 10, 2018 from one of Moshe's ASCs (i.e., Dynamic or HealthPlus) or from Moshe's hospital (i.e., Hudson Regional)

542.     Not only were the procedures themselves medically unnecessary and improper, but Premier also billed Allstate separately for medically unnecessary and unreasonable monitored anesthesia services in connection with each of the underlying procedures that were billed on

September 7, 2018, September 28, 2018, October 11, 2018, November 16, 2018, and December 10, 2018.

543.    Premier also billed excessive amounts ranging from $1,350.00 up to $9,600.00 for the unnecessary anesthesia services in connection with these already unwarranted procedures.

544.    Premier's use of heavy sedation (e.g., IV propofol and lidocaine) was not necessary for any of the procedures, and Premier's additional billing for these anesthesia services recklessly created an additional—and utterly needless—risk of significant complications

545.    Therefore, Premier's charges for L.R. are fraudulent and not compensable under New York's No-Fault law.

### G.    BILLING FOR UNSUPERVISED SERVICES

546.    Metro Pain employed several physician assistants and nurse practitioners during the relevant period.

547.    These physician assistants and nurse practitioners billed for patient consultations and examinations at Metro Pain's numerous clinic locations in New York.

548.    However, at no time was a physician concurrently present at these locations with the physician assistants and nurse practitioners so as to provide the supervision necessary to bill for such services under the NY Fee Schedule.

549.    Pursuant to Ground Rule 11.A of the NY Fee Schedule, treatment by physician assistants and nurse practitioners "must be rendered under the supervision of a physician who is authorized to treat workers' compensation patients."

550.    Ground Rule 11.A defines "supervision" as direct personal supervision requiring that the physician must be (a) at least present in the same office suite, and (b) immediately available

to provide assistance and direction through the time that the physician assistant or nurse practitioner is performing the services.

551.     No physician—and certainly not Shapiro—ever provided the required direct personal supervision to the persons working for Metro Pain during any part of the scheme.

552.     The physician assistants and nurse practitioners that worked for Metro Pain were never physically observed or monitored by a supervising physician, according to Shapiro.

553.     Thus, during the relevant period, no physician employed by Metro Pain was ever actually present in the "same office suite," or even in the same location to be "immediately available to provide assistance and direction through the time the [physician assistant] or [nurse practitioner] [was] performing the services," as required under the NY Fee Schedule Ground Rules.

554.     Accordingly, Metro Pain failed to comply with yet another applicable regulation when billing for these services, and Metro Pain is therefore ineligible for No-Fault payments on any of these claims.

## VI.     SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

555.     Throughout the course of this entire scheme, Moshe, Shapiro, and Kifaieh working through Metro Pain and/or Premier, (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

556.    Unless otherwise pled to the contrary, all documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

557.    Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

558.    The Defendants either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing patient treatment records and invoices/bills from Metro Pain to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

A.    **METRO PAIN ENTERPRISE**

559.    Moshe and Shapiro caused Metro Pain to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Metro Pain mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

560.    Moshe's participation in the management and control of Metro Pain, combined with Moshe's unlawful receipt of Metro Pain's professional physician fees and profits, rendered Metro Pain completely ineligible to receive No-Fault payments under New York law.

561.    Because Metro Pain was, in fact, unlawfully controlled by Moshe (who was not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide medical services), Moshe and Shapiro purposely caused Metro

Pain to make a misrepresentation each and every time that Metro Pain mailed (or was caused to mail) a document to Allstate claiming eligibility for reimbursement.

562.   Moreover, because (a) Moshe, as a non-physician, was never lawfully permitted to participate in the operation and management of Metro Pain, (b) Shapiro failed to engage in the practice of medicine through Metro Pain, (c) Moshe and Shapiro caused Metro Pain to seek payments from Allstate under New York's No-Fault laws (even though Metro Pain was not lawfully entitled to such reimbursement), and (d) Metro Pain used (or was caused to use) the U.S. Mail to seek such payments, it is clear that Moshe and Shapiro committed mail fraud.

563.   At all relevant times, Moshe and Shapiro knew that Metro Pain (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Metro Pain.

564.   Allstate estimates that the unlawful operation of the Metro Pain enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 4 and incorporated herein by reference as if set forth in its entirety.

**B.   PREMIER ENTERPRISE**

565.   Moshe, Shapiro, and Kifaieh caused Premier to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Premier mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

566.    Moshe's participation in the management and control of Premier, combined with Moshe's unlawful receipt of Premier's professional physician fees and profits, rendered Premier completely ineligible to receive No-Fault payments under New York law.

567.    Because Premier was, in fact, unlawfully controlled by Moshe (who was not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide medical services), Moshe, Shapiro, and Kifaieh purposely caused Premier to make a misrepresentation each and every time that Premier mailed (or was caused to mail) a document to Allstate claiming eligibility for reimbursement.

568.    Moreover, because (a) Moshe, as a non-physician, was never lawfully permitted to participate in the operation and management of Premier, (b) Shapiro and Kifaieh failed to engage in the practice of medicine through Premier, (c) Moshe, Shapiro, and Kifaieh caused Premier to seek payments from Allstate under New York's No-Fault laws (even though Premier was not lawfully entitled to such reimbursement), and (d) Premier used (or was caused to use) the U.S. Mail to seek such payments, it is clear that Moshe, Shapiro, and Kifaieh committed mail fraud.

569.    At all relevant times, Moshe, Shapiro, and Kifaieh knew that Premier (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Premier.

570.    Allstate estimates that the unlawful operation of the Premier enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 5 and incorporated herein by reference as if set forth in its entirety.

## VII. SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A. THE METRO PAIN ENTERPRISE

571.    Shapiro is registered with the State of New York as the sole officer, director, and shareholder of Metro Pain.

572.    Metro Pain was caused to operate from numerous locations throughout the Eastern District of New York.

573.    Moshe used his influence over Shapiro to obtain control of Metro Pain.   In exchange, Moshe gave Shapiro other positions at different Moshe-owned facilities.

574.    Moshe was motivated to exercise control over the operation and management of Metro Pain, not only to reap financial benefits from the medically unnecessary services and treatment billed for by Metro Pain, but also as a means to steer patients to his New Jersey surgery centers to ensure that his surgery centers could continue to bill Allstate for procedures that were not medically necessary or intended to treat any injury causally related to the purported underlying motor vehicle accidents.

575.    The documents created and filed with the State of New York related to Metro Pain deliberately omitted any reference to Moshe's involvement.

576.    The documents created and filed with the State of New York related to Metro Pain gave no indication to Allstate or the general public that Moshe in any way maintained a controlling interest in Metro Pain.

577.    Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Metro Pain, Allstate—even acting with reasonable

diligence—could not possibly have discovered the nature and extent of Moshe's domination of and control over Shapiro and Metro Pain.

578.    Moshe took purposeful steps to conceal his involvement in the day-to-day operations of Metro Pain, including the disguising of payments of professional fees and profits (that he otherwise would not be eligible to receive) under financing agreements that Moshe caused Metro Pain to enter into with entities owned and/or controlled by Moshe and/or individuals under Moshe's direction and control.

579.    Shapiro's and Moshe's purposeful concealment of Moshe's controlling interests in Metro Pain allowed Moshe to unlawfully control Metro Pain undetected.

580.    Overall, the Defendants' purposeful concealment of Moshe's controlling interest in Metro Pain allowed Moshe's continued unlawful control over Metro Pain in violation of New York law, and also prevented Allstate from discovering these Defendants' unlawful acts.

581.    At all relevant times during the operation of Metro Pain, Shapiro and Moshe purposely caused Metro Pain to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to healthcare services purportedly provided to patients.

582.    Because Moshe was not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide professional physician services, and because Metro Pain was organized as a physician-owned professional service corporation, Moshe was never lawfully entitled to participate in, or in any way direct, the operation and management of Metro Pain.

583. Accordingly, because Moshe unlawfully participated in the operation and management of Metro Pain throughout the relevant period, Metro Pain was caused to falsely claim eligibility for No-Fault reimbursement each and every time that it sought payment from Allstate.

584. Because Shapiro failed to engage in the practice of medicine through Metro Pain throughout the relevant period, Metro Pain was caused to falsely claim eligibility for No-Fault reimbursement each and every time that it sought payment from Allstate.

585. Further, throughout the relevant period, Shapiro attested (or caused the attestation) to the medical necessity of the services that were allegedly performed in connection with Metro Pain's patients, as well as the validity of the charges for such services and the compensability of the charges for such services under New York's No-Fault laws.

586. At all relevant times, Shapiro, as a duly licensed healthcare provider, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with each and every other aspect of his oath as a licensed physician.

587. As alleged above, Shapiro (or those persons working under his control) caused Metro Pain to create and submit to Allstate treatment records and demands for payment relative to healthcare services that were (a) unnecessary, (b) excessive, (c) not causally related to the underlying motor vehicle accident, (d) the product of an unlawful referral, and/or (e) purportedly rendered by a physician assistant or nurse practitioner who was not properly supervised by a physician.

588. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

589. Many of these facts—particularly (a) Moshe's participation in and control over the operation and management of Metro Pain, (b) Metro Pain's unlawful splitting of professional

physician fees and profits with Moshe through transactions between Metro Pain and certain entities owned or controlled by Moshe, and (c) Shapiro's failure to engage in the practice medicine through Metro Pain—are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

590.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

591.    Thus, every time that Shapiro and Moshe (along with those individuals working under their control) caused Metro Pain to demand money from Allstate, Shapiro and Moshe (and those individuals working under their control) necessarily certified that Metro Pain was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

592.    The full extent of Shapiro and Moshe's fraudulent and unlawful acts relative to their control over the Metro Pain enterprise—including (a) Moshe's participation in and control over the operation and management of Metro Pain, and (b) the unlawful channeling of Metro Pain's professional proceeds to Moshe through transactions that were structured between Metro Pain and certain entities that were owned and/or controlled by Moshe—were not, and could not have been, known to Allstate until shortly before it commenced this action.

### B.    THE PREMIER ENTERPRISE

593.    Shapiro was registered with the State of New Jersey as the sole officer, director, and shareholder of Premier between approximately November 4, 2017 and August 22, 2018.

594.    Kifaieh has been registered with the State of New Jersey as the sole officer, director, and shareholder of Premier since on or about August 22, 2018.

595.    Moshe induced Shapiro and Kifaieh to cede control over the operation and management of Premier to Moshe.

596.    Moshe used his position as the owner of Hudson Regional as leverage to induce Shapiro and Kifaieh, as his employees at Hudson Regional, to cede control of Premier to Moshe.

597.    Moshe was motivated to exercise control over the operation and management of Premier as a means to further extract financial benefits from the medically unnecessary services and treatment performed at his surgery centers, and to conceal his personal financial gain from the billing for medically unnecessary surgical procedures and anesthesia services purportedly performed at Dynamic, HealthPlus, and Hudson Regional.

598.    The documents created and filed with the State of New Jersey related to Premier deliberately omitted any reference to Moshe's involvement.

599.    The documents created and filed with the State of New Jersey related to Premier gave no indication to Allstate or the general public that Moshe in any way maintained a controlling interest in Premier.

600.    Based on the representations contained within the four corners of the documents filed with the State of New Jersey on behalf of Premier, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Moshe's domination of and control over Shapiro, Kifiaeh, and Premier.

601.    Shapiro's, Kifiaeh's, and Moshe's purposeful concealment of Moshe's controlling interests in Premier allowed Moshe to unlawfully control Premier undetected.

602.    Overall, the Defendants' purposeful concealment of Moshe's controlling interest in Premier allowed Moshe's continued unlawful control over Premier in violation of New York law, and also prevented Allstate from discovering these Defendants' unlawful acts.

603.    At all relevant times during the operation of Premier, Shapiro, Kifaieh, and Moshe purposely caused Premier to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to healthcare services purportedly provided to patients.

604.    Because Moshe was not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide professional physician services, and because Premier was organized as a physician-owned professional service corporation, Moshe was never lawfully entitled to participate in, or in any way direct, the operation and management of Premier.

605.    Accordingly, because Moshe unlawfully participated in the operation and management of Premier throughout the relevant period, Premier was caused to falsely claim eligibility for No-Fault reimbursement each and every time that it sought payment from Allstate.

606.    Because Shapiro and Kifaieh each failed to engage in the practice of medicine through Premier during their respective tenures as the record owner of Premier, Premier was caused to falsely claim eligibility for No-Fault reimbursement each and every time that it sought payment from Allstate.

607.    Further, throughout the relevant period, Shapiro and Kifaieh attested (or caused the attestation) to the medical necessity of the services that were allegedly performed in connection with Premier's patients, as well as the validity of the charges for such services and the compensability of the charges for such services under New York's No-Fault laws.

608.    At all relevant times, Shapiro and Kifiaeh, as duly licensed healthcare providers, were legally and ethically obligated to act honestly and with integrity, and were also legally and

ethically obligated to act in accordance with each and every other aspect of their oaths as licensed physicians.

609.    As alleged above, Shapiro and Kifaieh (or those persons working under their control) caused Premier to create and submit to Allstate treatment records and demands for payment relative to healthcare services that were (a) unnecessary, (b) excessive, (c) not causally related to the underlying motor vehicle accident, and/or (d) the product of an unlawful referral.

610.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

611.    Many of these facts—particularly (a) Moshe's participation in and control over the operation and management of Premier, (b) Premier's unlawful splitting of professional physician fees and profits with Moshe, and (c) Shapiro's and Kifaieh's failure to engage in the practice medicine through Premier—are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

612.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

613.    Thus, every time that Shapiro, Kifaieh, and Moshe (along with those individuals working under their control) caused Premier to demand money from Allstate, Shapiro, Kifaieh, and Moshe (and those individuals working under their control) necessarily certified that Premier was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

614.    The full extent of Shapiro, Kifaieh, and Moshe's fraudulent and unlawful acts relative to their control over the Premier enterprise—including (a) Moshe's participation in and

89

control over the operation and management of Premier, and (b) the unlawful channeling of Premier's professional proceeds to Moshe—were not, and could not have been, known to Allstate until shortly before it commenced this action.

## VIII.   ALLSTATE'S JUSTIFIABLE RELIANCE

615.   Each claim submitted to Allstate by (or on behalf of) Metro Pain and Premier was verified pursuant to Insurance Law § 403.

616.   At all relevant times, Shapiro and Kifiaeh, as duly licensed healthcare providers, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with each and every other aspect of their oaths as licensed healthcare professionals.

617.   To induce Allstate to promptly pay Metro Pain's and Premier's patient invoices, the Defendants submitted (or caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that Metro Pain and Premier were eligible to be reimbursed under New York's No-Fault laws.

618.   Further, to induce Allstate to promptly pay the fraudulent charges for healthcare services purportedly provided to Allstate claimants, the Defendants hired attorneys and law firms to pursue collection of the fraudulent and/or non-compensable charges from Allstate.  These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Metro Pain's and Premier's charges are not promptly paid in full.

619.   Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days.  The facially valid documents submitted to Allstate by (or on behalf of) Metro Pain and Premier in support of the fraudulent and/or non-compensable charges at issue,

combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

620.   At all relevant times, as alleged above, the Defendants concealed from Allstate the truth regarding Metro Pain's and Premier's reimbursement eligibility under New York law.

621.   In reasonable reliance on these misrepresentations, Allstate paid money to Metro Pain and Premier to its detriment.

622.   Allstate would not have paid these monies had the Defendants provided true and accurate information about Metro Pain's and Premier's reimbursement eligibility under New York law, including (a) Metro Pain's and Premier's No-Fault reimbursement eligibility under N.Y. Insurance Law § 5101, *et seq*., and (b) the fact and necessity of the services purportedly provided to those Allstate claimants and patients of Metro Pain and Premier eligible for insurance coverage under an automobile insurance policy issued by Allstate.

623.   As a result, Allstate was caused to make No-Fault payments totaling over $1,844,949.47 to Metro Pain and Premier in reasonable reliance on Metro Pain's and Premier's fraudulent No-Fault claim documentation, and the false representations regarding Metro Pain's and Premier's eligibility to receive payments under New York's No-Fault laws.

## VIII.   <u>DAMAGES</u>

624.   The Defendants' pattern of fraudulent and unlawful conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.  Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for:

a.   Payments made to Metro Pain Specialists, P.C. d/b/a Metro Pain Specialists Medicine in connection with first-party ("No-Fault") claims in excess of $1,619,999.00, the exact

amount to be determined at trial.  The chart annexed at Exhibit 6, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Metro Pain Specialists, P.C. d/b/a Metro Pain Specialists Medicine in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

b.  Payments made to Premier Anesthesia Associates, PA in connection with first-party ("No-Fault") claims in excess of $224,949.79, the exact amount to be determined at trial.  The chart annexed at Exhibit 7, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Premier Anesthesia Associates, PA in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

## IX.   CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### METRO PAIN PROFESSIONAL CORPORATION
### D/B/A METRO PAIN SPECIALISTS MEDICINE ENTERPRISE
### (Against Leonid Shapiro, M.D. and Yan Moshe a/k/a Yan Leviyev)

625.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 624 as if set forth fully herein.

626.   In furtherance of their operation and management of Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine ("Metro Pain"), Defendants Leonid Shapiro, M.D. and Yan Moshe a/k/a Yan Leviyev (collectively, "Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims in furtherance of their scheme to defraud.

627.   The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 4.

628.   Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

629.   Policies of insurance were delivered to insurers through the U.S. Mail.

630.   Payments made by Allstate to Metro Pain were delivered through the U.S. Mail.

631.   The Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to expenses and/or services that were purportedly performed through Metro Pain for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

632.   As a result of, and in reasonable reliance upon, the mailing and/or submission of these misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Metro Pain, for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

633.   The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling the Count I Defendants to continue without being detected.

634.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

635.   By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents and other claim-related materials in an

ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

636.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Metro Pain for the benefit of the Count I Defendants.

637.     Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

638.     Metro Pain constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

639.     The Count I Defendants associated with the Metro Pain enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

640.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count I Defendants' conduct.

641.     The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

642.     By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**METRO PAIN PROFESSIONAL CORPORATION**
**D/B/A METRO PAIN SPECIALISTS MEDICINE ENTERPRISE**
**(Against Leonid Shapiro, M.D. and Yan Moshe a/k/a Yan Leviyev)**

643.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 624 as if set forth fully herein.

644.    Throughout their participation in the operation and management of Metro Pain Professional Corporation d/b/a Metro Pain Specialists Medicine ("Metro Pain"), Defendants Leonid Shapiro, M.D. and Yan Moshe a/k/a Yan Leviyev (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

645.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Metro Pain by means of a pattern of racketeering activity, including numerous instances of mail fraud as set forth in Exhibit 4, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

646.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Metro Pain, even though Metro Pain, as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

647.    The purpose of the conspiracy was also to seek No-Fault payments from Allstate on behalf of Metro Pain in connection with medical services that were falsely reported, not medically necessary, not causally related to the purported underlying motor vehicle accident, purportedly rendered pursuant to an unlawful referral, and/or purportedly rendered by one or more physician assistant or nurse practitioner without the required supervision by a physician.

648.    The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing material misrepresentations and/or material omissions.

649.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II Defendants' unlawful conduct described herein.

650.     By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count II Defendants three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PREMIER ANESTHESIA ASSOCIATES, PA ENTERPRISE**
**(Against Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev)**

651.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 624 as if set forth fully herein.

652.     In furtherance of their operation and management of Premier Anesthesia Associates, PA ("Premier"), Defendants Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev (collectively, "Count III Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims in furtherance of their scheme to defraud.

653.     The Count III Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 5.

654.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

655.     Policies of insurance were delivered to insurers through the U.S. Mail.

656.     Payments made by Allstate to Premier were delivered through the U.S. Mail.

657.     As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to expenses and/or services that were purportedly performed through Premier for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

658.     As a result of, and in reasonable reliance upon, the mailing and/or submission of these misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Premier, for the benefit of one or more of the Count III Defendants, that would not otherwise have been paid.

659.     The Count III Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling the Count III Defendants to continue without being detected.

660.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

661.     By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents and other claim-related materials in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

662.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Premier for the benefit of the Count III Defendants.

663.    Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

664.    Premier constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

665.    The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

666.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count III Defendants' conduct.

667.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

668.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### PREMIER ANESTHESIA ASSOCIATES, PA ENTERPRISE
### (Against Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev)

669.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 624 as if set forth fully herein.

670.    Throughout their participation in the operation and management of Premier Anesthesia Associates, PA ("Premier"), Defendants Leonid Shapiro, M.D., Nizar Kifaieh, M.D.,

and Yan Moshe a/k/a Yan Leviyev (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

671.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Premier by means of a pattern of racketeering activity, including numerous instances of mail fraud as set forth in Exhibit 5, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

672.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Premier, even though Premier, as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

673.    The purpose of the conspiracy was also to seek No-Fault payments from Allstate on behalf of Premier in connection with medical services that were falsely reported, not medically necessary, not causally related to the purported underlying motor vehicle accident, and/or purportedly rendered pursuant to an unlawful referral.

674.    The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing material misrepresentations and/or material omissions.

675.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV Defendants' unlawful conduct described herein.

676.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count

IV Defendants three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT V
### COMMON LAW FRAUD
**(Against Metro Pain Specialists, P.C. d/b/a Metro Pain Specialists Medicine, Leonid Shapiro, M.D., and Yan Moshe a/k/a Yan Leviyev)**

677.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 624 as if set forth fully herein.

678.     Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine, Leonid Shapiro, M.D., and Yan Moshe a/k/a Yan Leviyev (collectively, "Count V Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for medical services under New York's No-Fault laws.

679.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (a) in every claim, the representation that Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine ("Metro Pain") was properly licensed and therefore eligible to seek and collect No-Fault payments under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) even though Metro Pain was unlawfully owned and controlled by one or more non-physician; (b) in every claim, the representation that Shapiro engaged in the practice of medicine through Metro Pain and that Metro Pain was therefore eligible to seek and collect No-Fault payments under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) even though Shapiro never practiced medicine through Metro Pain during the relevant period; and (c) in every claim, the representation that Metro Pain was eligible to seek and collect No-Fault

payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for the tests and treatment purportedly provided to Allstate claimants when, in fact, Metro Pain was not eligible to seek or collect No-Fault payments for these services because they were (i) not medically necessary, (ii) not intended to treat any injury causally related to the purported underlying motor vehicle accident, (iii) purportedly performed as the result of an unlawful referral, (iv) purportedly rendered by one or more physician assistant or nurse practitioner without the required supervision by a physician, and/or (v) purposely designed to financially enrich one or more non-physicians at the expense of patient care.

680.    The Count V Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) Metro Pain that were not compensable under New York's No-Fault laws.

681.    Allstate reasonably relied, to its detriment, upon the Count V Defendants' material misrepresentations concerning Metro Pain's eligibility to receive No-Fault reimbursement when making payments for medical services purportedly provided to patients through Metro Pain.

682.    Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault payments totaling over $1,619,999.00 in connection with fraudulent bills submitted by the Count V Defendants through Metro Pain.

## COUNT VI
## COMMON LAW FRAUD
### (Against Premier Anesthesia Associates, PA, Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev)

683.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 624 as if set forth fully herein.

684.     Premier Anesthesia Associates, PA, Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev (collectively, "Count VI Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for medical services under New York's No-Fault laws.

685.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (a) in every claim, the representation that Premier Anesthesia Associates, PA ("Premier") was properly licensed and therefore eligible to seek and collect No-Fault payments under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) even though Premier was unlawfully owned and controlled by one or more non-physician; (b) in every claim, the representation that Shapiro or Kifaieh engaged in the practice of medicine through Premier and that Premier was therefore eligible to seek and collect No-Fault payments under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) even though Shapiro and Kifiaeh never practiced medicine through Premier during the relevant period; and (c) in every claim, the representation that Premier was eligible to seek and collect No-Fault payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for the anesthesia services purportedly provided to Allstate claimants when, in fact, Premier was not eligible to seek or collect No-Fault payments for these services because they were (i) not medically necessary, (ii) not intended to treat any injury causally related to the purported underlying motor vehicle accident, (iii) purportedly performed as the result of an unlawful referral, and/or (iv) purposely designed to financially enrich one or more non-physician at the expense of patient care.

686.     The Count VI Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate

to pay charges submitted by (or on behalf of) Premier that were not compensable under New York's No-Fault laws.

687.     Allstate reasonably relied, to its detriment, upon the Count VI Defendants' material misrepresentations concerning Premier's eligibility to receive No-Fault reimbursement when making payments for medical services purportedly provided to patients through Premier.

688.     Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault payments totaling over $224,949.00 in connection with fraudulent bills submitted by the Count VI Defendants through Premier.

## COUNT VII
## UNJUST ENRICHMENT
### (Against Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine, Leonid Shapiro, M.D., and Yan Moshe a/k/a Yan Leviyev)

689.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 624 as if set forth fully herein.

690.     As detailed above, Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine, Leonid Shapiro, M.D., and Yan Moshe a/k/a Yan Leviyev (collectively, "Count VII Defendants") have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

691.     The Count VII Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault claims submitted by (or on behalf of) Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine.

692.     The payments received by the Count VII Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

693.     The Count VII Defendants' retention of Allstate's payment violates fundamental principles of justice, equity, and good conscience.

694.     By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count VII Defendants have been unjustly enriched in an amount totaling $1,619,999.00, the exact amount to be determined at trial.

**COUNT VIII**
**UNJUST ENRICHMENT**
**(Against Premier Anesthesia Associates, PA, Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev)**

695.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 624 as if set forth fully herein.

696.     As detailed above, Premier Anesthesia Associates, PA, Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev (collectively, "Count VIII Defendants") have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

697.     The Count VIII Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault claims submitted by (or on behalf of) Premier Anesthesia Associates, PA.

698.     The payments received by the Count VIII Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

699.     The Count VIII Defendants' retention of Allstate's payment violates fundamental principles of justice, equity, and good conscience.

700.     By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count VIII Defendants have been unjustly enriched in an amount totaling $224,949.00, the exact amount to be determined at trial.

## COUNT IX
### DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Metro Pain Specialists Professional Corporation
### d/b/a Metro Pain Specialists Medicine)

701.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1 through 624 as if set forth fully herein.

702.    To be eligible to receive assigned No-Fault benefits under New York's No-Fault law, an assignee provider must adhere to all applicable statutes that grant the authority to provide professional medical services.

703.    In view of Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine's ("Metro Pain") (a) illegal corporate structure; (b) unlawful control by one or more non-physician (i.e., Yan Moshe a/k/a Yan Leviyev); (c) unlawful sharing of professional physician fees with one or more non-physician; (d) billing for tests, treatment, and procedures even though its record owner (i.e., Leonid Shapiro, M.D.) failed to engage in the practice of medicine through it; (e) billing for medically unnecessary tests, treatment, and procedures; (f) billing for tests, treatment, and procedures that were not intended to treat any injury causally related to the purported underlying motor vehicle accident; (g) billing for procedures that were the product of an unlawful referral; and (h) billing for tests, treatment, and services that were purportedly performed by one or more physician assistant or nurse practitioner without the required supervision by a physician, Metro Pain has, at all relevant times, been operating in violation of one or more New York State, New Jersey, or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault payments from Allstate, including, but not limited to, No-Fault benefits that were assigned to Metro Pain by its patients.

105

704.    Metro Pain continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

705.    Metro Pain continues to challenge Allstate's prior claim denials.

706.    Metro Pain continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

707.    A justifiable controversy exists between Allstate and Metro Pain because Metro Pain rejects Allstate's ability to deny such claims.

708.    Allstate has no adequate remedy at law.

709.    Metro Pain will also continue to demand No-Fault payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Metro Pain.

710.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that Metro Pain, at all relevant times, (a) was fraudulently incorporated; (b) was unlawfully owned, operated, managed, and controlled by one or more non-physician; (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services; (d) billed for tests, treatment, and procedures even though its record owner failed to engage in the practice of medicine through it; (e) billed for medically unnecessary tests, treatment, and procedures; (f) billed for tests, treatment, and procedures that were not intended to treat any injury causally related to the purported underlying motor vehicle accident; (g) billed for procedures that were the product of an unlawful referral; and (h) billed for tests, treatment, and services that were purportedly performed by one or more physician assistant or nurse practitioner without the required supervision by a physician, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT IX
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Premier Anesthesia Associates, PA)

711.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1 through 624 as if set forth fully herein.

712.   To be eligible to receive assigned No-Fault benefits under New York's No-Fault law, an assignee provider must adhere to all applicable statutes that grant the authority to provide professional medical services.

713.   In view of Premier Anesthesia Associates, PA's ("Premier") (a) illegal corporate structure; (b) unlawful control by one or more non-physician (i.e., Yan Moshe a/k/a Yan Leviyev); (c) unlawful sharing of professional physician fees with one or more non-physician; (d) billing for tests, treatment, and procedures even though its record owners (i.e., Leonid Shapiro, M.D. and Nizar Kifaieh, M.D.) failed to engage in the practice of medicine through it; (e) billing for medically unnecessary anesthesia services; (f) billing for anesthesia services that were not intended to treat any injury causally related to the purported underlying motor vehicle accident; and (g) billing for services that were the product of an unlawful referral, Premier has, at all relevant times, been operating in violation of one or more New York State, New Jersey, or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault payments from Allstate, including, but not limited to, No-Fault benefits that were assigned to Premier by its patients.

714.   Premier continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

715.    Premier continues to challenge Allstate's prior claim denials.

716.    Premier continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

717.    A justifiable controversy exists between Allstate and Premier because Premier rejects Allstate's ability to deny such claims.

718.    Allstate has no adequate remedy at law.

719.    Premier will also continue to demand No-Fault payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Premier.

720.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Premier, at all relevant times, (a) was fraudulently incorporated; (b) was unlawfully owned, operated, managed, and controlled by one or more non-physician; (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services; (d) billed for anesthesia services even though its record owners failed to engage in the practice of medicine through it; (e) billed for medically unnecessary anesthesia services; (f) billed for anesthesia services that were not intended to treat any injury causally related to the purported underlying motor vehicle accident; and (g) billed for services that were the product of an unlawful referral, and thus has no standing to submit or receive assigned No-Fault benefits.

## X.    **DEMAND FOR RELIEF**

### **COUNT I**
### **VIOLATIONS OF 18 U.S.C. § 1962(c)**
### **METRO PAIN SPECIALISTS PROFESSIONAL CORPORATION**
### **D/B/A METRO PAIN SPECIALISTS MEDICINE ENTERPRISE**
### **(Against Leonid Shapiro, M.D. and Yan Moshe a/k/a Yan Leviyev)**

a.    AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### METRO PAIN SPECIALISTS PROFESSIONAL CORPORATION
### D/B/A METRO PAIN SPECIALISTS MEDICINE ENTERPRISE
### (Against Leonid Shapiro, M.D. and Yan Moshe a/k/a Yan Leviyev)

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### PREMIER ANESTHESIA ASSOCIATES, PA ENTERPRISE
### (Against Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev)

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### PREMIER ANESTHESIA ASSOCIATES, PA ENTERPRISE
### (Against Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev)

a.      AWARD Allstate's actual and consequential damages to be established at trial;

    b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

    c.      GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

    d.      GRANT all other relief this Court deems just.

## COUNT V
## COMMON LAW FRAUD
**(Against Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine, Leonid Shapiro, M.D., and Yan Moshe a/k/a Yan Leviyev)**

    a.      AWARD Allstate's actual and consequential damages to be established at trial; and

    b.      GRANT all other relief this Court deems just.

## COUNT VI
## COMMON LAW FRAUD
**(Against Premier Anesthesia Associates, PA, Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev)**

    a.      AWARD Allstate's actual and consequential damages to be established at trial; and

    b.      GRANT all other relief this Court deems just.

## COUNT VII
## UNJUST ENRICHMENT
**(Against Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine, Leonid Shapiro, M.D., and Yan Moshe a/k/a Yan Leviyev)**

    a.      AWARD Allstate's actual and consequential damages to be established at trial; and

    b.      GRANT all other relief this Court deems just.

## COUNT VIII
## UNJUST ENRICHMENT
**(Against Premier Anesthesia Associates, PA, Leonid Shapiro, M.D., Nizar Kifaieh, M.D., and Yan Moshe a/k/a Yan Leviyev)**

    a.      AWARD Allstate's actual and consequential damages to be established at trial; and

b.      GRANT all other relief this Court deems just.

## COUNT IX
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Metro Pain Specialists Professional Corporation
### d/b/a Metro Pain Specialists Medicine)

a.      DECLARE that Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine, at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York State, New Jersey, or local licensing requirement necessary to provide professional physician services in New York and New Jersey;

b.      DECLARE that Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine's activities are unlawful;

c.      DECLARE that Allstate has no obligation to pay any past, present, or future No-Fault insurance claims submitted by Metro Pain Specialists Professional Corporation d/b/a Metro Pain Specialists Medicine; and

d.      GRANT all other relief this Court deems just.

## COUNT X
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Premier Anesthesia Services, PA)

a.      DECLARE that Premier Anesthesia Services, PA, at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York State, New Jersey, or local licensing requirement necessary to provide professional physician services in New York and New Jersey;

b.      DECLARE that Premier Anesthesia Services, PA's activities are unlawful;

c.      DECLARE that Allstate has no obligation to pay any past, present, or future No-Fault insurance claims submitted by Premier Anesthesia Services, PA; and

d.      GRANT all other relief this Court deems just.

## JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.


[SIGNATURE PAGE FOLLOWS]

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbrink.com
Jasmine G. Vieux (JG1805)
jvieux@smithbrink.com
Michael W. Whitcher (MW7455)
mwhitcher@smithbrink.com
1325 Franklin Ave, Suite 320
Garden City, NY 11530
(347) 710-0050

*Attorneys for the Plaintiffs,*
*Allstate Insurance Company, Allstate Indemnity*
*Company, Allstate Property & Casualty Insurance*
*Company, and Allstate Fire and Casualty Insurance*
*Company*

Dated: October 7, 2021